UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
ERIC A. LONGMIRE,                                     :

                                    Plaintiff,        :        **<u>COMPLAINT</u>**

      -against-                                       :        **JURY TRIAL**
                                                               **DEMANDED**
GUY P. WYSER-PRATTE and                               :
WYSER-PRATTE MANAGEMENT CO., INC.,
                                                      :
                                    Defendants.
------------------------------------------------------------------------X

      Plaintiff, by and through his attorneys, Warshaw Burstein Cohen Schlesinger & Kuh,

LLP, as and for his complaint against defendants, alleges as follows:

<u>JURISDICTION AND VENUE</u>

     1.      Plaintiff, Eric A. Longmire is a resident of the State of New Jersey.

     2.      Upon information and belief, defendant Guy P. Wyser-Pratte ("GWP") is a

resident of New York City.

     3.      Upon information and belief, defendant Wyser-Pratte Management Co., Inc.

("WPMC") is a corporation duly organized and existing pursuant to the laws of the State of New

York with its principal place of business located in New York, New York.

     4.      This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(2), because there is

complete diversity of citizenship between plaintiff and defendants, and because the matter in

controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

     5.      Venue lies in this District over all claims, pursuant to 28 U.S.C. §§ 1391(a)(1) and

(a)(2), because all defendants reside in this District within the meaning of 28 U.S.C. § 1391(c),

and because a substantial part of the events or omissions giving rise to such claims occurred in

this District.

{489808;4}

6.      On or about November 12, 2004, plaintiff dual-filed a timely Charge of
Discrimination ("Charge") with the Equal Employment Opportunity Commission ("EEOC"), and
the New York State Division of Human Rights ("Division").  A copy of that Charge with
attachments is annexed hereto as Exhibit 1 and incorporated herein by reference.

7.      The defendants submitted their Statement of Position to the EEOC on January 21,
2005, wherein they challenged the EEOC's jurisdiction because WPMC had fewer than the
required 15 minimum employees.

8.      By letter dated May 9, 2005 plaintiff informed the EEOC that he had decided not
to challenge the defendants' jurisdictional challenge.

9.      By letter dated March 18, 2005, the EEOC notified the Charging Party, i.e.,
plaintiff, that the EEOC lacked jurisdiction to investigate his Charge because of an insufficient
number of employees employed at defendant WPMC, which plaintiff decided to not contest. A
copy of the March 18, 2005 EEOC letter is annexed hereto as Exhibit 2 and incorporated herein
by reference.

10.     The EEOC also issued a "right to sue" letter to plaintiff.  A copy of the March 18,
2005 EEOC "right to sue" letter is annexed hereto as Exhibit 3 and incorporated herein by
reference.

11.     Plaintiff then proceeded to refile the Charge directly with the Division.
Subsequently, plaintiff requested that the Division treat the complaint as dismissed and to annul
his election of remedies so that he may pursue his action in Court.  Such request was granted and
a copy of the letter of May 11, 2005 is annexed hereto as Exhibit 4 and incorporated herein by
reference.

## NATURE OF ACTION

12.     This action arises out of the wrongful, unlawful and discriminatory conduct of defendant WPMC and defendant GWP, the Chief Executive Officer, president and owner of WPMC, against plaintiff, a former employee of defendant WPMC.

13.     During most of plaintiff's thirteen-year career at WPMC, his salary level was lower than it should have been.  Defendants paid plaintiff a lower salary than a white employee in his position would have been paid.

14.     Plaintiff was also paid less salary than other WPMC professionals who are white and who were at his level or lower, including one, Mr. Wolfgang Armbruster, who was in fact his direct report.

15.     Beginning no later than December of 2004, the defendants racially profiled and racially "blackmailed" only the plaintiff to accept an illegal job assignment, namely to commit perjury in, and obstruct, GWP's divorce court proceedings on behalf of GWP, for the main purpose of mitigating his wife's threat, to wit, that she would reveal to the authorities that GWP not only had committed insider trading in the securities of the Telxon Corporation ("Telxon"), but also had defeated through perjury and obstruction of the ensuing Securities and Exchange Commission ("SEC") insider trading investigation that lasted between December 11, 1998 until it was settled by an Order dated May 9, 2001.

16.     Although plaintiff had been invited by GWP, in December of 1990 to help create his new company, WPCM, and while plaintiff simultaneously had titles of Senior Managing Director, Director of Research, Assistant Portfolio Manager, and Research Analyst, as well as had the position of "second-in-command," such titles and senior most position did not reflect the

truth about the low salary and the disparate, and discriminatory, treatment that plaintiff received while employed by WPMC.

17.     Plaintiff assisted GWP in building WPMC from a start-up company with essentially no assets under management and no profits, to having $550,000,000 under management at its height, while profits grew from negligible sums to millions of dollars; GWP made more money with plaintiff than he had otherwise made throughout his entire career.

18.     As set forth more fully below, the wrongful, unlawful and discriminatory conduct of the defendants consisted of racial discrimination, racial profiling, racial exploitation and harassment, leading to the termination of plaintiff's employment and career at WPMC after 13 years, as well as his 20-plus year career on Wall Street.

## FACTS

19.     Plaintiff is of dual-race, being the child of an African American father and a French white mother.

20.     Plaintiff's features are not notably those of one from the African race. His complexion is light, his facial features sharp, and his hair is relatively straight; he is frequently taken to be someone of Mediterranean or other non-Northern European heritage; that is to say, some background other than African.

21.     Plaintiff decided decades ago, that in order to avoid racial discrimination, by both whites and blacks, against him, and to live his true identity as that of a person of multiple races, he would live his life as a "passer," he would self-identify as "white" at his place of employment, i.e. as someone who crosses freely and undetected over the racial divide by not being openly of the African race.

22.     Involuntary disclosure of ethnicity or race, or in the vernacular, "outing," is for "passers" what "coming out of the closet" is for "gay Americans." The "outing" decision, be it for a "passer" or a "gay American," is extremely traumatic and is a personal one to be made only by the person in question, and by no one else and certainly not by one's employer in possession of the "passer's" secret, as a management tool, who is trying to coerce an employee.

23.     WPMC is deeply involved in the financial community, i.e., is a well known Wall Street hedge fund investment advisory firm that is engaged in the business of Risk Arbitrage (takeover stocks) and Corporate Governance (putting companies "in play", and championing the rights of shareholders).

24.     It is common knowledge on Wall Street that individuals "of color" in general and African Americans in particular are not welcome, especially in high level positions, and have had difficulty in obtaining employment, promotion, compensation, and position of any significant consequence at Wall Street firms; the exceptions being infrequent and of recent vintage.

25.     Thus, plaintiff's position, in the lexicon in the black community as "passing for white" has been a matter of utmost concern to plaintiff, and therefore, he has kept it as a closely guarded secret.

26.     Plaintiff was originally hired at Prudential Securities, Inc. ("Prudential") by GWP in 1989 to work as a risk arbitrage Research Analyst in the Risk Arbitrage Department ("Department") which GWP had managed since 1971, and for which GWP had complete investment responsibility.

27.     During plaintiff's time at Prudential, GWP, unaware of plaintiff's racial background, would frequently tell plaintiff to make sure you "check for niggers in the woodpile"

(amongst many ethnically offensive epithets) when referring to the need to identify unforeseen risks in a particular investment.

28.     Plaintiff found GWP's comments to be extremely offensive and disturbing but did not say anything at the time, feeling that he was risking being the subject of retaliation.

29.     Therefore, plaintiff tried to ignore, and work around, the frequent "nigger" epithet by GWP along with his other epithets about "towel heads" for Arabs and "hook nose" for Jews.

30.     GWP would also refer to the couple who wait on him at his country estate as "two Polaks."   For example, during his Securities and Exchange Commission ("SEC") Telxon insider trading deposition on April 7, 1999, GWP testified as follows:

> Q:     Does anyone else live there with you at that address?
>
> A:     Yes, I have a couple that lives in one of the cottages on the property.  And if you were to ask me to spell their names, I couldn't.  They're two Polaks who -- one is named Yanish, his first name, and the other is Barbara Sitech, and Yanish has a great big long Polish name that I couldn't tell you for all the good will impossible.

31.     Due to excessive losses in 1990 resulting from GWP's poor investment decisions, Prudential discharged GWP and also closed down the Department in December of 1990.

32.     The employees of the Department, including plaintiff, simply were "let go" and on February 15, 1990, GWP and plaintiff opened WPMC, as an independent company involved in risk arbitrage; plaintiff's position at the newly created WPMC was again Research Analyst.

33.     As this was a new departure and a new beginning, plaintiff felt that he had little to lose at that time and wanted to bring an end to GWP's offensive remarks which plaintiff found to be especially intolerable, and unworkable, coming, not only from his supervisor, but also his partner in this new venture.  Accordingly, plaintiff requested that GWP cease using racial

epithets in his presence, and that he control the racist behavior of some of the white employees, especially George Dudla, Marty Teevan, and Ann Zito.

34.     He also advised GWP at that time of his racial background but implored him to keep such fact secret.

35.     GWP agreed to keep plaintiff's racial background secret.

36.     GWP never adopted any race anti-discrimination policy or procedures at WPMC, and he never controlled his behavior or the behavior of his employees.

37.     The atmosphere at WPMC was racially intolerant when it came to African Americans in particular, with GWP being the biggest offender.

38.     As a result of this racially hostile environment, plaintiff had no choice but to minimize his contacts with the employees to the bare essential, sufficiently to discharge professionally all his job responsibilities, lest an employee tell him yet another racist joke or make another racist comment, and the employees had little contact with him.

39.     For example, in Mac Kelly's SEC Telxon deposition on April 23, 1999, Mr. Kelly states the following:

>     Q  Do you have any daily interactions with Mr. Longmire?
>
>     A  Eric when he arrives in the morning will usually swing by the desk and say "anything big going on" and I would say it's this deal, this deal, this deal if there are deals, Paris is up or down, whatever, if there's some big development overnight I would tell him.   It's like a pit stop.
>
>     Q  Anything outside of that?
>
>     A  No.

40.     The only African Americans that GWP ever hired at WPMC in the 13 years plaintiff was with him were those who were sent by the employment agencies temporarily to fill secretarial positions, and his chauffeur.

41.     Notably, except for plaintiff, who was already hired, GWP never knowingly employed an African American in any professional, executive capacity whatsoever.

42.     The individual that GWP almost immediately hired as WPMC's new Director of Research, after he terminated plaintiff, is Adam Treanor, a white male.

43.     Mr. Treanor resigned from Merrill Lynch, Pierce, Finner & Smith, Inc., in February of 2004, where he had been an investment banker from September of 2002 to February of 2004, and started his employment at WPMC on February 17, 2004.

44.     At the time GWP hired Mr. Treanor to be WPMC's Director of Research, Mr. Treanor had neither merger arbitrage and corporate governance investing experience, nor "buy side" experience, other than the small exposure he had received while he worked for the defendants, spending a great deal of time working for plaintiff, as a summer associate during the months of May of 2000 to August of 2000.

45.     African Americans did not present the appropriate Wall Street image that GWP wanted to project to clients.

46.     GWP rejected plaintiff's request that he at least hire an African American as a secretary. GWP told plaintiff that he preferred white blonde women because they projected his sought-after image.

47.     One white Irish male employee at WPMC, Neil O'Hara, the Assistant Portfolio Manager at the time, once complained to plaintiff that "niggers had a bad smell."

48.     Moreover, George Dudlia, WPMC's head of operations said, for all to hear, that "it should not be a crime when you hit a black man on the head with a baseball bat because you're doing him a favor by improving his intelligence," to which many of the employees, including GWP, laughed and agreed.

49.     Mr. O'Hara and other employees frequently used the word "nigger," while working at WPMC and made other racists comments and "jokes," many of them in front of GWP.

50.     It was in this racially hostile environment -- that defendants did nothing to discourage -- that plaintiff tried to "survive" and tried to function, fearing that he would be "outed" at a moment's notice by GWP.

51.     Plaintiff feared that he would be retaliated against were he to complain to GWP, especially since GWP had ignored plaintiff's request that he control his racist behavior and that of his employees, and especially since GWP had failed to establish at WPMC any race anti-discrimination policies and procedures, to distribute to the employees any such policy, and to designate a representative to whom an employee, e.g., plaintiff, could report racism at WPMC.

52.     In fact, the only person to whom plaintiff could complain was to GWP himself, and he not only *was* the cause of the problem with the racism at WPMC, but also the very same person to whom plaintiff had already complained and who had ignored plaintiff's prior requests to control his racist behavior, as well as that of his employees.

53.     During the years plaintiff was employed at WPMC, GWP earned more money than he had made during his entire career before he had employed plaintiff.

54.     GWP preferred to present white faces to potential or existing clients. The only time he took plaintiff on a marketing trip during the 13 years plaintiff worked at WPMC was

when he was forced to do so by two African American consultants whom plaintiff had convinced GWP to hire. While plaintiff was a "passer," GWP knew his secret and undoubtedly feared third parties somehow learning the truth about WPMC's second-in-command, Assistant Portfolio Manager, and Director of Research.

55.     After learning plaintiff's secret, GWP disdained plaintiff. For example, when plaintiff was married in 1997, after having been with GWP for almost a decade, GWP refused to allow plaintiff to take his wife on her honeymoon, however, GWP did allow the head trader, Michael Kelly, who is white, to take two weeks off for his honeymoon. GWP also allowed Mr. O'Hara and Patty Beggs, his white secretary, to take their honeymoon vacations.

56.     GWP explained to plaintiff that plaintiff could not take off time for a honeymoon because "people like you don't deserve honeymoons."

57.     GWP did not send plaintiff a wedding gift at the time of his wedding day, instead GWP sent plaintiff a "wedding gift" during the time the SEC was investigating GWP for insider trading in the securities of Telxon -- several years after plaintiff's wedding ceremony. This was a rather transparent insult as well as, arguably, an attempt to bribe plaintiff and ensure his future cooperation with the SEC.

58.     Additionally, in the late afternoon of Thursday, December 26, 2002, plaintiff suffered a broken shoulder in Utah, while visiting his parents for the holidays, and he was seen by an emergency room physician in Ogden, Utah.

59.     The emergency room physician prescribed plaintiff narcotic pain medication, and told plaintiff to remain in Utah until seen by an expert orthopedic surgeon.

60.     Mrs. Longmire, who is a doctor, evaluated the x-rays along with the emergency room doctor, concurred with the recommendation that he remain in Utah until seen by an orthopedic surgeon, and administered the narcotic pain medication.

61.     On Friday, December 27, 2002, plaintiff placed a telephone call to the defendants and told them about the accident, and that, on doctor's orders, he had to remain in Utah, at least until he was evaluated by an orthopedic surgeon, and that he was on sleep inducing pain medication as well.

62.     Plaintiff and his family were utterly shocked when the defendants refused even this simple, and humanitarian, request from plaintiff, and were especially shocked when the defendants had ordered him back to the office by Monday, December 30, 2002, or suffer the consequences.

63.     Having no choice, the plaintiff lashed his broken arm to his torso to immobilize it, and without taking his prescription pain medication because it incapacitated him, he flew back to the New York City area.

64.     Similarly, on Monday, December 30, 2002, plaintiff again lashed his arm to his torso, did not take his pain medication, and while improperly dressed for a New York City winter because he could not move his arm to get properly dressed, he took public transportation to work.

65.     On Monday, when he arrived at work, plaintiff presented himself to GWP, told GWP that he was in great pain, and asked for time off in order to be able to take his sleep inducing pain medication while recuperating.

66.     GWP refused to give plaintiff even one day off for him to recuperate, telling him to "take the pain."

67.     Shortly thereafter, plaintiff was seen by an orthopedic surgeon at New York City's Hospital for Special Surgery, who confirmed that plaintiff had broken his shoulder in several places, although it was not dislocated requiring surgery.

68.     The surgeon advised plaintiff to remain home, his arm immobilized, and prescribed immediate physical therapy to strengthen the undamaged muscles that were holding his arm in his shoulder lest they become damaged and allow his arm to dislocate itself from his shoulder, and additional sleep inducing narcotic pain killers.

69.     Plaintiff informed defendants about the orthopedic surgeon's diagnosis, the need for surgery should he tear, by, for example, slipping and falling, the remaining tissue that was holding his arm in his shoulder, his orders, and the pain medication, and asked defendants for time off; again, defendants refused his request.

70.     For weeks, in unbearable agony, and at great risk to his health and broken shoulder, improperly dressed during a New York City winter, often braving the snow and ice, plaintiff went to work, and back home again to work for the defendants who had refused to give him any time off to take his pain medication and to properly recuperate from his injury.

71.     GWP, however, had allowed all his white employees to take the necessary time off to recuperate from their illnesses, surgeries, and injuries.

72.     For example, the defendants even paid for Danielle DeRohan, a secretary, to have her surgery near her parents, which placed her "out of network."

73.     George Dudla, who has a medical condition, was allowed to take the time he needed to recuperate.

74.     GWP himself had taken two weeks off at home while he recuperated from hip-replacement surgery.

75. GWP's disdain for plaintiff "trickled down" to the other employees as well. For example, in late 1995, plaintiff was on crutches, recuperating from major ankle surgery (a steel plate and seven screws had been installed in plaintiff's left ankle). While speaking about business issues with Carl Weiss, WPMC's then Chief Financial Officer, and while plaintiff was supporting himself on two crutches, Mr. Weiss punched plaintiff in the face in full view of the employees, all for no apparent, or ever disclosed, reason.

76. Plaintiff complained to GWP about the attack, and GWP did absolutely nothing, to the contrary, ordering plaintiff not to do anything as well.

77. In addition, plaintiff suspected, upon information and belief, that GWP had used plaintiff's secret disclosure of his racial background to exploit plaintiff with respect to salary and the large number of jobs GWP told him to perform, and this was confirmed by Vivien Wyser-Pratte, GWP's wife, who was also an employee of WPMC.

78. During the period that plaintiff was the second-in-command and Assistant Portfolio Manager, among his other jobs, other than GWP and plaintiff, no employee at WPMC had profit making/loss avoiding responsibilities, that is, investment decision-making responsibilities.

79. Vivien Wyser-Pratte told plaintiff that GWP had told her, that he paid plaintiff less than he otherwise would have, because he could "get away with it" by reason of plaintiff's difficulty, because of race, in obtaining alternative employment at proper salary levels on Wall Street.

80. Plaintiff worked at a low salary, routinely 12-hour days, 50 weeks a year, despite the fact, that, as shown in WPMC's own documents, he had significant investment decision-

making responsibilities, held many jobs and was the senior most executive at WPMC, second only to GWP.

81.     For example, on page 37 of Global Governance Partners, L.P.'s Offering Memorandum, a Delaware Limited Partnership, dated May 2001 the defendants stated the following:

> Eric Longmire is a Senior Managing Director, Assistant Portfolio Manager and Director of Research at [WPMC]. He has worked with Guy Wyser-Pratte for the past 12 years. Mr. Longmire was instrumental in developing [WPMC's] corporate governance strategy, tactics and tools, including the Shareholder Rights By-Law. He is responsible for executing the firm's U.S. and Canadian corporate governance initiatives which include conducting proxy fights and publicly challenging corporate executives and directors at annual meetings. Mr. Longmire has also assisted various corporate governance academics in publishing papers on important topics in the field and has been often quoted in the press on these matters.
>
> Mr. Longmire has been in the money management business for a total of fourteen years, eleven of which have been with Mr. Wyser-Pratte as noted above.

82.     Upon information and belief, as also confirmed to plaintiff by GWP's wife, plaintiff's salary was not commensurate with his level of responsibilities, number of jobs, and position, and especially as compared to white professionals both within WPMC and on Wall Street generally.

83.     Upon information and belief, while plaintiff was "second in command," Assistant Portfolio Manager and Director of Research simultaneously, he was paid at most, only the same salary, or less salary than was paid to Mr. Weiss and Mr. Armbruster, respectively, two lower ranking professionals at WPMC who are white, and who also had fewer jobs with no investment decision-making responsibilities.

84.     In fact, Mr. Wolfgang Armbruster, whose salary was higher than that of plaintiff's, was a Research Analyst who worked for and reported to plaintiff; Mr. Armbruster had one job and no investment decision-making responsibilities.

85.     Moreover, upon information and belief, when plaintiff was made Assistant Portfolio Manager and second-in-command, while he also remained as Director of Research since GWP had order him to, his salary compensation was significantly lower than that of Mr. O'Hara, his predecessor, although Mr. O'Hara had not been required to be Director of Research to earn his higher salary.

86.     Additionally, upon information and belief, when plaintiff was "second in command" and also performing the jobs of three people -- Assistant Portfolio Manager, Director of Research, and Research Analyst -- his salary was lower than that of the white newly hired Chief Legal Officer, Mr. Schacht, who effectively did only one job.

87.     Furthermore, upon information and belief, Mr. Schacht, who essentially had one job and no investment responsibility, was given 25 business days vacation, as compared to Mr. Longmire, who was only given 10 business days vacation, notwithstanding his senior most position, the fact that he was performing the jobs of three people, and the fact that he had investment responsibilities.

88.     The complained of conduct continued to the day that the defendants illegally terminated plaintiff, be it the first termination in January of 2004, or the second in March of 2004.

89.     Finally, GWP used plaintiff's secret disclosure, not only to select plaintiff, but also to extort him to commit perjury in 2003 and in early 2004, in order for GWP to gain advantage in the divorce\custody\property division proceeding between himself and his wife,

Vivien, and to protect himself from Vivien who had threatened to expose him to the authorities with respect to the Telxon SEC insider trading investigation against GWP.

90.     In autumn 2003 and January 2004, the divorce proceedings, between GWP and his wife, were apparently at a juncture, such that he was attempting to "get an edge" in those proceedings and also to defend himself from his wife who had threatened to expose the fact that GWP had committed insider trading and had perjured himself in the SEC's insider trading investigation.

91.     Knowing of plaintiff's racial vulnerability and exploiting, again, his knowledge of plaintiff's secret which GWP had promised to honor, GWP engaged in a vicious and brutal campaign directed at his wife, in relation to their divorce and sought to use plaintiff as a tool, that he could turn into a weapon and a shield in that divorce.

92.     Knowing about plaintiff's vulnerability, having profiled his "blackness" that he knew was a liability on Wall Street, GWP specifically targeted plaintiff -- and only plaintiff -- and when plaintiff refused to commit perjury in GWP's divorce proceeding, GWP exacerbated the hostility in plaintiff's work environment.

93.     GWP's campaign to compel plaintiff to commit perjury escalated, the more plaintiff continued to refuse to acquiesce in his demands, and defendants engaged in a process which was calculated further to harass and intimidate plaintiff to force plaintiff to submit, and which, in fact had a devastating impact on his daily work experience culminating in at least two tangible adverse employment actions when defendants twice terminated plaintiff.

94.     For example, in December of 2003, to impress upon plaintiff the seriousness of Vivien's threats, GWP gave to the plaintiff a copy of a letter, dated November 25, 2003, from GWP's divorce lawyer, Ms. Helene Brezinsky, to Mrs. Vivien Wyser-Pratte's then divorce

lawyer, Ms. Caroline Krauss-Brown ("Brezinsky Letter").  The Brezinsky Letter states in

relevant part the following:

> With regard to my client's [GWP's] ability to drive his son, we do not accept your client's [Mrs. Wyser-Pratte's] self imposed self serving demands.  For years, she has attempted to impose her conditions and demands on my client's relationship with his son. Guy has been driving his son and himself safely for years.  As you know, we have grave concerns about your client's use of prescription drugs and the impact on her ability to function.
>
> \*       \*       \*
>
> Further, the tone of your letter is offensive and inappropriate.  Your statement that Guy's commencement of an action for divorce is a "path which will inevitably lead to ruin" seems to be a threat.  I do not see your statements as minimizing the damage, but of improperly using a threat to intimidate Guy from pursuing a divorce action.  Please cease such threats.

95.     GWP told plaintiff that the "threats" referred to in the Brezinsky Letter pertained

mainly to the SEC's Telxon insider trading investigation discussed in Exhibits A and B to Exhibit

1 annexed hereto.

96.     Plaintiff was shocked to have been shown this letter, and to have been put in this

entirely inappropriate position since it had nothing to do with his job responsibilities or his status

as an employee of WPMC.  Furthermore, plaintiff knew that GWP had provided lies to be

incorporated into the first paragraph of the Brezinsky Letter since GWP had previously admitted

to plaintiff that he knew that his wife was not a drug addict, and that she was a "good mother."

97.     At an earlier time, GWP had also admitted to plaintiff that Vivien had denied

being a drug addict, and even had produced a medical examination report, from her doctor,

proving that was the case.

98.     Especially troubling to plaintiff was the fact that GWP wanted him to do

something that even GWP's own daughter, Joelle O'Reilly-Hyland, had refused to do.  During

her SEC Telxon insider trading deposition, she refused to "help" her father, and instead she pled the "Fifth" during the entirety of her deposition.

99.     Ms. O'Reilly-Hyland's actions, in fact, hurt her father's case with the SEC.

100.    Plaintiff believed that GWP had no right to ask him to do something that his own daughter had refused him.

101.    In the first few days of January of 2004, GWP called plaintiff into his office, stating that there was going to be a custody hearing at the end of the month.

102.    GWP wanted plaintiff's final decision as to whether he would testify falsely for him.

103.    GWP wanted plaintiff to establish that his wife was a liability to WPMC, and he said "there is a simple solution to this." When the plaintiff inquired as to what that was, GWP told plaintiff that "you should lie and back me against Vivien." And if Vivien argues the point, it is "'two against one and no one is going to believe her because she is a broken down drug addict who is involved in a nasty divorce."

104.    Additionally, on January 7, 2004, at 12:58 p.m., GWP came to plaintiff's office and told plaintiff that he had just come from a meeting with Paul Curran, a partner at Kaye Scholer LLP, who also had represented him in the Telxon insider trading investigation. He said that Mr. Curran told GWP that his estranged wife Vivien's own legal problems -- her "criminal use of drugs," and the fact that she was an "accomplice" on GWP's insider trading cover-up scandal involving the SEC's investigation -- would make it unlikely that she would fulfill her threat to expose GWP to the authorities and that plaintiff should have no problems agreeing to perjure himself for GWP since the odds were such that plaintiff's testimony on the insider trading matter would not be needed.

105.    Again, and on other subsequent occasions, plaintiff refused GWP's demands.
Plaintiff, as part of his devastating work experience, discussed the hostility and abuse problems
that GWP was creating, with both Kurt Schacht, Esq., the company's in-house counsel who was
acutely aware of GWP's behavior, who suggested that plaintiff perform his duties at home, as
well as with Roger Zuckerman, Esq., GWP's own personal lawyer whom GPW had told plaintiff
in January of 2004 to call because "Roger knows everything," and who, in turn, convinced
plaintiff to "hire" the same criminal lawyer, Mr. Steve Cohen, Esq., whom GWP had retained on
behalf of plaintiff in connection with his SEC insider trading investigation regarding Telxon.

106.    Again, GWP agreed to pay for Mr. Cohen's legal services, but not for any lawyer
of plaintiff's own choosing.

107.    In and around mid-January of 2004, plaintiff also told Mr. Zuckerman by
telephone that "I am really scared by Guy's behavior.  He is pressuring me to lie about Vivien
and what I [now] know about what happened in Telxon, in his divorce court, and I don't want
to."

108.    Mr. Zuckerman, acting as "broker" between the defendants and plaintiff, offered
to plaintiff that he, Mr. Zuckerman, arrange to have GWP pay for the very same criminal defense
attorney that GWP in the past had hired for plaintiff, and paid for, in connection with the Telxon
SEC insider trading investigation.

109.    When plaintiff agreed with Mr. Zuckerman to rehire Mr. Cohen, Mr.  Zuckerman
personally arranged with the defendants that they pay Mr. Cohen's fees, and he also personally
contacted Mr. Cohen, told Mr. Cohen of the fee arrangement, and instructed Mr. Cohen to
contact plaintiff.

110.    Mr. Cohen then telephoned plaintiff saying that "Roger Zuckerman says you need my help regarding a problem about Guy's wife," and that GWP had agreed to pay his fees.

111.    However, defendants ignored the fact that they had hired, and agreed to pay for, Mr. Cohen on behalf of plaintiff because GWP subsequently directly threatened plaintiff and his family when he stated to the plaintiff: "If you don't testify the way I want you to, I'm going to 'out' you.  If you don't lie for me, you're dead. Think of your family."

112.    Those were the last words ever spoken to plaintiff by GWP.

113.    The defendants' illegal actions--the racial profiling and racial coercion--and the resulting "game of cat and mouse," and especially when added to the other discrimination plaintiff had suffered at the hands of the defendants for some 13 years, had utterly shattered their professional working relationship so as to make it impossible for plaintiff to do his job, which was to work closely with GWP and make investment recommendations to him.

114.    In order to escape the relentless pressure at the office from GWP to commit perjury in a court of law on his behalf, plaintiff suggested to GWP's in-house counsel, Mr. Schacht, that he be placed in a consultative role.

115.    GWP's "campaign" to get plaintiff to commit a crime had extended over a period of no less than two months and until plaintiff could stand it no longer, and especially after having been devastated by the totality of the defendants' abuse and exploitation in general, and over the past few months in late 2003, early 2004, in particular.  Fearing that GWP would make good on his threat and "out" him, after January 22, 2004, plaintiff did not return to the office, but he did so with the full knowledge of WPMC's in-house counsel, and agreement, since he was the one who had first broached with plaintiff the idea of plaintiff's working from home.

116.    Given the earlier discussion with house counsel and his suggestion that plaintiff work at home as his presence in the office was not essential to perform his duties, plaintiff, of course, was reassured that he would continue to be compensated in the ordinary course, while being available to work at home, given the hostile situation created by defendants which left plaintiff with no viable alternative.  Plaintiff's job duties lent themselves to "virtual office" status.

117.    Plaintiff did in fact receive his January 16, 2004 to January 31, 2004 pay period salary by the regular automated depositing of a check by defendants to his bank account, as well as his medical benefits.

118.    However, plaintiff was shocked to have received no salary compensation on February 15, 2004 by the regular automated depositing of a check by defendants to his bank account for the pay period February 1, 2004 to February 15, 2004.

119.    On or about February 17, 2004, plaintiff called Mr. Cohen and told him about the problem; he contacted Judith Lockheart, Esq., one of GWP's employment lawyers who told him that plaintiff had been terminated effective January 31, 2004 but she refused to give Mr. Cohen a reason for plaintiff's termination or identify the date that defendants had decided to terminate him.

120.    During that conversation, Ms. Lockheart also informed Mr. Cohen that the defendants had removed plaintiff from WPMC's payroll and medical plan, and she told Mr. Cohen that GWP was offering severance to plaintiff.

121.    At that time, plaintiff did not know, and Ms. Lockheart did not tell Mr. Cohen, that Mr. Treanor had commenced working as WPMC's Director of Research on February 17, 2004.

122.     After plaintiff was told that he had been terminated, in February of 2004, and about the insulting severance, plaintiff refused the severance and instead asked Mr. Cohen to talk to Ms. Lockheart to have him reinstated at WPMC.  Mr. Cohen spoke with Ms. Lockheart, and plaintiff was later told by Mr. Cohen that he would be in fact reinstated starting March 1, 2004, and in March of 2004 he did receive two regular salary payments, and his medical benefits, but with respect to that month only.

123.     After GWP had reinstated plaintiff at WPMC, GWP inexplicably, and without warning, again terminated plaintiff effective as of March 30, 2004.

124.     This time, the defendants permanently removed plaintiff from WPMC's payroll, and stopped his medical benefits as well.

125.     As a result, WPMC's payroll documents show that, for the entire year 2004, WPMC paid plaintiff his January and March salary, but not his February salary.

126.     Plaintiff's termination is especially discriminatory in light of the disparate treatment that the defendants afforded to Mr. Kelly, a white male.  On the morning of November 18, 2002, Mr. Kelly went home after having abruptly tendered, to Mr. Dudla, his resignation because he was concerned that WPMC's lawsuit against Telxon would reopen the SEC Telxon insider trading investigation, during which the SEC had deposed him on April 23, 1999.  The defendants refused to accept Mr. Kelly's resignation, placed him on a paid leave of absence, had their lawyers work furiously to appease Mr. Kelly's concerns, and those of his lawyer-father, and, once successful, took him back with no adverse consequences to him whatsoever.

127.     Mr. Kelly, a white male, is still employed by WPMC, whereas plaintiff is not, while another white male, Mr. Treanor, now also works at WPMC, as its Director of Research.

128.    Upon information and belief, GWP gave severance of one year's salary to a non-African American woman, Mia Spence, whom he hired in August of 2003 as his secretary, and terminated in March of 2004.  However, he offered plaintiff considerably less than one year's salary (and no amount to reflect bonus compensation) -- despite the fact that plaintiff had 13 years employment at WPMC as compared to her 7 or 8 months.

129.    After plaintiff was terminated in March of 2004, GWP confirmed plaintiff's longstanding worst fears -- GWP did indeed carry out his threat to expose plaintiff's secret regarding his race.

130.    In or about April 2004, in retaliation, and to damage plaintiff in the marketplace, at an afternoon meeting, with Mr. Laurant Guillome, who plaintiff knows professionally, Mr. Guillome's friend, and GWP's lawyers all present, GWP revealed plaintiff's secrets.

131.    Mr. Guillome, who is French, worked in New York City with a Park Avenue hedge fund.

132.    Subsequently, Mr. Guillome sought confirmation of GWP's assertions which plaintiff provided.

133.    Before GWP had "outed" plaintiff, Mr. Guillome had offered to help plaintiff find another job and had taken a copy of plaintiff's resume to send to his contacts.

134.    Plaintiff has yet to hear back from Mr. Guillome about any job prospects and he now ignores plaintiff.

135.    The defendants also illegally retaliated against plaintiff when they illegally refused to grant plaintiff access to his 401(k) plan account and to his deferred compensation account, both of which were under the control of WPMC as the plaintiff's fiduciary, but legally belonged to the plaintiff, putting plaintiff in a cash-flow crisis.

136.    Consequently, plaintiff contacted the Department of Labor which intervened quickly on his behalf under the Employee Retirement Income Security Act of 1974 (ERISA) with respect to his 401(k) plan and compelled GWP to give plaintiff the necessary paper work that allowed plaintiff to "rollover" his 401(k) plan.  Finally, WPMC's Chief Financial Officer sent plaintiff the paper work on May 21, 2004.

## AS AND FOR A FIRST CLAIM OF RELIEF FOR
## VIOLATION OF THE NEW YORK HUMAN RIGHTS LAW

137.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 136 as set forth above.

138.    Plaintiff was and is a member of a group covered and protected by the New York Human Rights Law.

139.    Defendants discriminated against plaintiff in the terms, conditions or privileges of his employment based on his race in violation of Section 296 of the New York State Executive Law also known as the New York Human Rights Law.

140.    In taking the above described discriminatory actions, defendants acted with malice and reckless indifference to plaintiff's rights.

141.    In addition, defendants improperly retaliated against plaintiff when he objected to and complained of such discrimination and improper conduct, in violation of the New York Human Rights Law.

142.    Defendants' threat of retaliation to plaintiff coupled with their subsequent termination of plaintiff constituted quid pro quo discrimination.

143.    As a result of defendants' discriminatory acts, plaintiff has suffered and will continue to suffer irreparable injury, emotional distress and other compensable damage unless and until this Court grants relief.

144.    By reason of defendants' willful and unlawful acts set forth herein, plaintiff is entitled to damages in an amount equal to the salary, bonus, medical and fringe benefits he would have earned up to and including the date of normal retirement and additional expenses incurred by him by reason of defendants' acts.

## AS AND FOR A SECOND CLAIM OF RELIEF FOR
## VIOLATION OF THE NEW YORK CITY ADMINISTRATIVE CODE

145.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 144 as set forth above.

146.    Plaintiff was and is a member of a group covered and protected by the New York City Administrative Code also known as the New York City Human Rights Law.

147.    Defendants discriminated against plaintiff in the terms, conditions or privileges of his employment based on his race in violation of Section 8-107 of the New York City Administrative Code.

148.    As a result of defendants' discriminatory acts, plaintiff has suffered and will continue to suffer irreparable injury, emotional distress and other compensable damage unless and until this Court grants relief.

149.    By reason of defendants' willful and unlawful acts set forth herein, plaintiff is entitled to damages in an amount equal to the salary, bonus, medical benefits and fringe benefits he would have earned up to and including the date of normal retirement and additional expenses incurred by him by reason of defendants' acts.

150.    The actions of defendants were vicious and wantonly unfeeling and cruel and caused and continue to cause plaintiff enormous mental anguish and emotional distress which was or reasonably could and should have been foreseen by defendants.

151.     By reason of the foregoing facts, plaintiff, in addition to his other damages, has suffered and continues to suffer and will in the future suffer, severe mental anguish and emotional distress, and is entitled to damages and to punitive damages pursuant to Section 8-502 of the New York City Administrative Code.

## AS AND FOR A THIRD CLAIM OF RELIEF FOR VIOLATION OF 42 U.S.C. § 1981

152.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 151 as set forth above.

153.     Plaintiff was and is a member of a group covered and protected by 42 U.S.C. § 1981.

154.     Defendants discriminated against plaintiff on the basis of his race in violation of 42 U.S.C. § 1981.

155.     As a result of defendants' discriminatory acts, plaintiff has suffered and will continue to suffer irreparable injury, emotional distress and other compensable damage unless and until this Court grants relief.

156.     By reason of defendants' willful and unlawful acts set forth herein, plaintiff is entitled to compensatory damages sufficient to fully compensate him for pain and suffering caused by the defendants' discriminatory conduct and to punitive damages.

WHEREFORE, plaintiff respectfully demands judgment against defendants and in favor of plaintiff as follows:

(a)     on the first, second and third claims for relief, declaring these acts and practices to be violations of the New York Human Rights Law, the New York City Administrative Code and 42 U.S.C. § 1981;

(b)    on the first, second and third claims for relief, enjoining and permanently restraining these violations of the New York Human Rights Law, the New York City Administrative Code and 42 U.S.C. § 1981;

(c)    on the first, second and third claims for relief, directing defendants to take such affirmative steps as are necessary to ensure that the effects of these unlawful practices are eliminated and do not continue to affect plaintiff's employment opportunities;

(d)    on the first and second claim for relief, directing defendants to place plaintiff in the position he would have occupied but for defendants' discriminatory and retaliatory treatment of him, and making him whole for all earnings and other benefits he would have received but for defendants' discriminatory and retaliatory treatment including but not limited to wages, bonuses, pension, and other lost benefits, and interest thereon;

(e)    on the first claim for relief, directing defendants pursuant to the New York Human Rights Law to pay plaintiff compensatory damages, in an amount to be proven at the trial of this action, including damages for emotional distress, humiliation, and pain and suffering, and interest thereon;

(f)    on the second claim for relief, directing defendants pursuant to the New York City Human Rights Law to pay plaintiff compensatory damages, in an amount to be proven at the trial of this action, including damages for emotional distress, humiliation, and pain and suffering, and interest thereon;

(g)    on the second claim for relief, directing defendants pursuant to the New York City Human Rights Law to pay plaintiff punitive damages;

(h)     on the third claim for relief, directing defendants to award plaintiff compensatory

damages, in an amount to be proven at the trial of this action, including damages

for emotional pain, suffering, inconvenience, mental anguish caused by the

defendants' discriminatory conduct, pursuant to and within the statutory

limitations of 42 U.S.C. § 1981a;

(i)     on the third claim for relief, directing defendants pursuant to 42 U.S.C. § 1981a to

pay plaintiff punitive damages;

(j)     awarding plaintiff his costs and disbursements herein, together with his attorneys'

fees, and

(k)     granting plaintiff such other and further relief as the Court may deem just and

proper.

Dated: New York, New York
July 26, 2005

                                        WARSHAW BURSTEIN COHEN
                                        SCHLESINGER & KUH, LLP

                                        By:   _____
                                                Avi Lew (AL 6132)
                                        Attorneys for Plaintiff
                                        555 Fifth Avenue
                                        New York, New York 10017
                                        (212) 984-7700