UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

ERIC A. LONGMIRE,                             :             05 Civ. 6725 (SHS)
                                              :
                        Plaintiff,            :             OPINION & ORDER
                                              :
           -against-                          :
                                              :
GUY P. WYSER-PRATTE and                       :
WYSER-PRATTE MANAGEMENT CO., INC.,            :
                                              :
                        Defendants.           :
-------------------------------------------------------------x

SIDNEY H. STEIN, U.S. District Judge.

## TABLE OF CONTENTS

I.  **FACTS** ...............................................................................................................................2
    A.  Longmire's Racial Background ...................................................................................3
    B.  Longmire's Employment at Prudential Bache Securities, Inc. ....................................5
    C.  Longmire's Employment at WPMC .............................................................................5
    D.  Alleged Use of Racial Epithets and Racial Discrimination at WPMC .........................8
    E.  Wyser-Pratte's Divorce Proceedings ........................................................................11
    F.  The Termination of Longmire's Employment at WPMC .............................................12
    G.  History of this Action.................................................................................................14
II.  **SUMMARY JUDGMENT STANDARD** ....................................................................14
III. **DISCUSSION** ......................................................................................................................15
    A.  Longmire's Employment Discrimination Claims .......................................................15
        1.  ***The Threat To Disclose Longmire's "Racial Secret"***...................................17
            a.  *Longmire's Race Was Not a "Secret"* ....................................................17
            b.  *Disclosure of Longmire's Race Is Not Actionable Conduct*....................18
        2.  ***Hostile Work Environment*** .............................................................................19
            a.  *Legal Standard* ......................................................................................19
            b.  *Timeliness* ..............................................................................................20
            c.  *Discussion* ..............................................................................................22
        3.  ***Disparate Pay*** ...............................................................................................24
            a.  *Legal Standard* ......................................................................................24
            b.  *Timeliness* ..............................................................................................25
            c.  *Discussion* ..............................................................................................25
        4.  ***Retaliation*** ....................................................................................................28
            a.  *Legal Standard* ......................................................................................28
            b.  *Discussion* ..............................................................................................29
    B.  Longmire's Common Law Tortious Interference with Contract Claim.........................31
            a.  *Legal Standard* ......................................................................................31
            b.  *Timeliness* ..............................................................................................32
            c.  *Discussion* ..............................................................................................32
IV.  **CONCLUSION** ...................................................................................................................34

This litigation concerns an employment relationship gone badly awry.  Plaintiff Eric A. Longmire alleges that over the course of more than a decade he was the victim of race-based discrimination and harassment by his former boss, defendant Guy P. Wyser-Pratte, and Wyser-Pratte's financial services company, Wyser-Pratte Management Co., Inc. ("WPMC"). Longmire's allegations include that Wyser-Pratte threatened to – and eventually did – publicly disclose Longmire's "dual race" background, which Longmire claims was a "closely guarded secret"; that he was subjected to a hostile work environment in the course of his employment at WPMC; that he was the victim of disparate compensation on the basis of his race; and that he was retaliated against by defendants.  Longmire brings those discrimination claims pursuant to 42 U.S.C. § 1981, section 296 of the New York State Executive Law (the "New York Human Rights Law," or "NYHRL") and section 8-107 of the New York City Administrative Code (the "New York City Human Rights Law," or "NYCHRL").  In addition, Longmire contends that Wyser-Pratte tortiously interfered with plaintiff's oral employment contract at WPMC.

Following the conclusion of discovery proceedings, defendants have now moved pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment in their favor. As set forth more fully below, plaintiff's claims are either not legally actionable or plaintiff has failed to adduce any genuine issue of material fact that prevents the Court from deciding this action as a matter of law.  The motion for summary judgment is granted in favor of defendants and this action is dismissed with prejudice.

I.      **FACTS**

The following facts are either undisputed or the Court has resolved any ambiguities in the record and drawn all factual inferences in Longmire's favor, as it must.

A.    Longmire's Racial Background

Longmire's father is African-American and his mother is Caucasian.  (Defendants' Local Rule 56.1 Statement of Undisputed Material Facts ("Def.'s 56.1") ¶ 6; Plaintiff's Reponses to Defendants' Local Rule 56.1 Statement ("Pl.'s Rep. 56.1") ¶ 6.)  Longmire describes himself as a person of "dual race" who has "the appearance of one who is Mediterranean or Semitic," Declaration of Eric Longmire dated Oct. 25, 2006 ("Longmire Decl.") ¶ 3, and whose "features are not notably those of one from the African race," Plaintiff's Statement of Material Facts Defendants May Dispute ("Pl.'s 56.1") ¶ 1.  Longmire also asserts that "to avoid racial discrimination on Wall Street" he decided "decades ago" to live his life as a "passer" – i.e., "a black/white biracial person" who self-identifies as "white" at his place of employment – rather than self-identifying as "black" or "biracial."  (Pl.'s 56.1 ¶ 3; Longmire Decl. ¶ 3.)

Despite claiming that he has self-identified as "white" for "decades," Longmire identified himself as "black" on his application for admission to the Stanford Graduate School of Business in 1985.  (Def.'s 56.1 ¶ 7; Deposition of Eric Longmire dated Feb. 16, 2006 ("Longmire Dep.") at 71:9-25, Ex. 2 to Affidavit of Margo G. Ferrandino dated Oct. 6, 2006 ("Ferrandino Aff."), Ex. A to Declaration of Avi Lew dated Oct. 26, 2006 ("Lew Decl.").)  Despite this, Longmire contends that he kept his racial background "closely guarded" in his professional life and did not disclose it to any "white" person on Wall Street, with the exception of Wyser-Pratte, although he did disclose it to non-whites with whom he worked.  (Def.'s 56.1 ¶¶ 10, 12; Pl.'s Rep. 56.1 ¶¶ 10, 12; Longmire Decl. ¶¶ 4, 6.)

It is undisputed, however, that Longmire publicly disclosed his racial background in other situations.  For example, Longmire sued the board of his cooperative apartment in 1995 for discriminating against him on the grounds that the board had failed to take appropriate action

against his neighbors who had been intentionally "making excessive noise." Longmire claimed in publicly filed court documents that both the intentional noise-making and the failure of the board to act were racially motivated. (Def.'s 56.1 ¶ 13; Pl.'s Rep. 56.1 ¶ 13; Supplemental Response to First Set of Interrogatories of Defendant Great Neck Terrace Owners Corp. dated July 11, 1995, Ferrandino Aff. Ex. 9.) Indeed, the first paragraph of the complaint that Longmire filed with the New York State Division of Human Rights (the "SDHR") – which subsequently became part of the public record – reads simply: "I am black." (Def.'s 56.1 ¶ 13; Pl.'s Rep. 56.1 ¶ 13; SDHR Complaint of Eric Longmire dated Feb. 3, 1995, Ferrandino Aff. Ex. 11 ¶ 1.) Longmire's complaint was dismissed by the SDHR, which found no probable cause to believe that Longmire had been discriminated against by the board on the basis of race or color. (Lew Decl. Ex. H at EL 0794.) In connection with his subsequently filed Article 78 petition in New York state court seeking judicial review of that determination, Longmire prepared an affidavit in which he again identified himself as "black." (Affidavit of Eric Longmire dated May 22, 1997, Ferrandino Aff. Ex. 10 ¶ 2.) Longmire further asserted that the board knew that he was a person of color because he had told them he was. (Def.'s 56.1 ¶ 13; Pl.'s Rep. 56.1 ¶ 13; Longmire Dep. at 161:3-24; Longmire's Reply Memorandum of Law in Support of his Petition to Reverse the Order and Determination of the SDHR dated July 18, 1997, Ferrandino Aff. Ex. 12.)

In 2000, WPMC hired two African-American consultants – Deborah Draughan and Michael Gefferd. (Pl.'s 56.1 ¶ 19.) Despite the allegedly "secret" nature of his racial background, Longmire disclosed it to Draughan. (Def.'s 56.1 ¶ 12; Pl.'s Rep. 56.1 ¶ 12.) The record does not indicate whether Longmire asked Draughan to keep that information secret. Longmire testified at his deposition in this action that in general he was not "trying to keep [his

'secret'] from blacks" because they were not the source of the discrimination against him. (Longmire Dep. at 155:16-25.)

In addition, Longmire began receiving e-mails at his WPMC e-mail account from the Stanford Business School Black Alumni Association in August 2003. (Def.'s 56.1 ¶ 14; E-mails to Longmire dated Aug. 25, 2003 to Feb. 14, 2006, Ferrandino Aff. Ex. 13; Pl.'s Rep. 56.1 ¶ 14.) Longmire testified that he was contacted because he had "expressed an interest to help other blacks [from Stanford Business School] who wanted to get on Wall Street." (Def.'s 56.1 ¶ 14; Longmire Dep. at 157:4-17.)

### B.      Longmire's Employment at Prudential Bache Securities, Inc.

In 1989, Wyser-Pratte hired Longmire to work at Prudential Bache Securities, Inc. as a research analyst in the Risk Arbitrage Department, which Wyser-Pratte managed. (Def.'s 56.1 ¶ 3; Pl.'s Rep. 56.1 ¶ 3; Pl.'s 56.1 ¶ 4.) Although Longmire did not disclose his racial identity to Wyser-Pratte while they were at Prudential, he did disclose it to Praveen Sharma, who also worked there for Wyser-Pratte. (Def.'s 56.1 ¶ 10; Pl.'s Rep. 56.1 ¶ 10; Longmire Decl. ¶ 6.) Longmire alleges that Wyser-Pratte frequently made "ethnically offensive epithets." (Longmire Decl. ¶ 6.) Wyser-Pratte also allegedly frequently told Longmire to "check for niggers in the woodpile" when referring to the need to identify risks in an investment.[1] (Id.) Longmire claims that he never lodged a formal complaint because he feared retaliation. (Pl.'s Rep. 56.1 ¶ 3; Pl.'s 56.1 ¶ 4.) Wyser-Pratte and Longmire each left Prudential in 1990. (Longmire Decl. ¶ 7.)

### C.      Longmire's Employment at WPMC

In 1991, Longmire accepted an invitation from Wyser-Pratte to join WPMC, an independent risk arbitrage company started by Wyser-Pratte. (Def.'s 56.1 ¶ 4; Pl.'s Rep. 56.1 ¶

---

[1]  It should be noted that Wyser-Pratte denies making that remark – or ever using that racial epithet – at Prudential or WPMC. (Deposition of Guy Wyser-Pratte dated Feb. 23, 2006 ("Wyser-Pratte Dep.") at 98:21-99:4, 100:12-25, Ferrandino Aff. Ex. 3, Lew Decl. Ex. B.)  For purposes of this motion, the Court assumes that he used that language.

4.)  Wyser-Pratte is the sole owner, President, and Chief Executive Officer of WPMC.  (Def.'s 56.1 ¶ 2; Pl.'s Rep. 56.1 ¶ 2.)  Longmire began as Research Analyst at a base salary of $85,000 plus "incentive compensation" of 7.5% of the incentive fees that WPMC would earn on funds raised and managed for third party investors.  (Pl.'s 56.1 ¶ 5; Longmire Decl. ¶ 8.)  That agreement was oral and was not memorialized in writing.  (Pl.'s Rep. 56.1 ¶ 5.)  Longmire's initial supervisor was Phoebe Yen, WPMC's Director of Research, whose base salary was $95,000, plus incentive compensation of 10% of the incentive fees.  (Pl.'s 56.1 ¶ 36.)

At some point during his long tenure at WPMC – which lasted for 13 years from 1991 until his termination in March 2004 – Longmire became the only person at WPMC (aside from Wyser-Pratte) with investment decision-making responsibilities and its most senior employee.  (Pl.'s 56.1 ¶ 8; Longmire Decl. ¶ 28.)  It is undisputed that Longmire earned approximately $5.5 million in compensation during his thirteen-year tenure at WPMC.  (Def.'s 56.1 ¶ 16; Pl.'s Rep. 56.1 ¶ 16.)  Although his annual compensation fluctuated depending on the performance of the business – and his corresponding share of the incentive fees – Longmire received average annual compensation in excess of $400,000.  Indeed he earned in excess of $800,000 in 2000, more than anyone else at WPMC other than Wyser-Pratte himself.  (Def.'s 56.1 ¶ 18; Pl.'s Rep. 56.1 ¶ 18; Longmire Dep. at 226:8-25.)

Nonetheless, Longmire contends that once he disclosed his racial identity to Wyser-Pratte shortly after starting at WPMC – as discussed below – he was not compensated fairly.  (Pl.'s 56.1 ¶ 35; Longmire Decl. ¶ 27.)  For example, Longmire became Director of Research – the position previously held by Yen – in 1991, but his base salary remained set at $85,000 with a 7.5% incentive fee share.  (Pl.'s 56.1 ¶ 36; Longmire Decl. ¶ 31.)  In 1995, Longmire took on the additional responsibility of Assistant Portfolio Manager, replacing Neil O'Hara in that role.

6

(Pl.'s 56.1 ¶ 37; Longmire Decl. ¶ 31.)  O'Hara, who is white, had been paid $120,000 with an incentive fee share of 10%, but Longmire's base salary was increased to only $100,000 in April 1995 and his incentive fee share remained at 7.5% – even though by November 1995 Longmire was acting as both Director of Research and Assistant Portfolio Manager.[2]  (Pl.'s 56.1 ¶ 37; Longmire Decl. ¶ 31.)

In 2000, Wolfgang Armbruster, another white WPMC employee, resigned; Armbruster had been paid a salary of $120,000 – a higher base salary than Longmire's, even though Armburster in fact reported to him – and an incentive fee share of 2.5%.  (Pl.'s 56.1 ¶ 39; Longmire Dep. at 113:4-15.)  Longmire took on Armbruster's responsibilities and received an increase in base salary from $100,000 to $150,000 – effective December 2000 – and an increase in his incentive fee share from 7.5% to 10% at the start of 2001.  (Pl.'s 56.1 ¶ 42; Longmire Decl. ¶ 31; Longmire Dep. at 112:12-17, 113:4-17, 224:16-21, 226:11-20.)

With the exception of Kurt N. Schacht, WPMC's Chief Legal Officer, no WPMC employee earned more total compensation than Longmire from 2001 until January 2004.  (Def.'s 56.1 ¶ 18; Longmire Dep. at 217:19-24.)  Schacht is white.  (Def.'s 56.1 ¶ 19.)  Following the loss of a major client in 2003, Schacht's base salary was decreased from $170,000 to approximately $125,000 and Longmire's base salary was temporarily decreased to approximately $130,000, albeit with a promise from Wyser-Pratte to Longmire that he would "make up the difference at the end of the year."  (Def.'s 56.1 ¶ 19; Pl.'s 56.1 ¶ 42; Longmire Dep. at 215:2-216:7.)  At some point, Wyser-Pratte allegedly told his wife, Vivien Wyser-Pratte,

---

[2] During his tenure at WPMC, Longmire also held the positions of Vice President, Managing Director, and, as of 1998, Senior Managing Director.  (Longmire Decl. ¶ 38; Wyser-Pratte Dep. at 38:1-14, 39:19-21; Lew Decl., Ex. I at WP 0458.)

that he could underpay Longmire because it would be difficult for Longmire – because of his race – to obtain alternative employment on Wall Street.[3]  (Longmire Decl. ¶ 27.)

 In sum, Longmire's base salary was increased only twice during his thirteen years at WPMC, during which time he earned approximately $5.5 million in compensation and was, during his final four years at WPMC, one of its highest paid employees.  (Def.'s 56.1 ¶ 16; Pl.'s Rep. 56.1 ¶ 16; Pl.'s 56.1 ¶ 48.)

   D. <u>Alleged Use of Racial Epithets and Racial Discrimination at WPMC</u>

 Shortly after he commenced working at WPMC in 1991, Longmire claims that he requested that Wyser-Pratte cease using racial epithets in his presence and "control the racist behavior of other employees."  (Pl.'s 56.1 ¶ 14; Longmire Decl. ¶ 12.)  Longmire also contends that at that time, he disclosed his racial background to Wyser-Pratte, who allegedly agreed to keep that information private.  (Pl.'s 56.1 ¶ 16; Longmire Decl. ¶¶ 12-13.)[4]  However, Wyser-Pratte and WPMC employees allegedly continued to use racial and ethnic slurs in Longmire's presence, and, in particular, Wyser-Pratte continued to use the epithet "Pollack" to refer to his Polish housekeepers – a term to which Longmire raised a specific objection because of Polish members of his own family.[5]  (Pl.'s 56.1 ¶ 15; Longmire Decl. ¶ 13.)  It is undisputed that WPMC – a relatively small firm – never adopted any internal anti-discrimination policy or procedures.  (Pl.'s 56.1 ¶ 10; Wyser-Pratte Dep. at 128:12-15.)

---

[3] Wyser-Pratte denies that he ever made that statement.  (Wyser-Pratte Dep. at 171:10-15.)  Longmire has failed to substantiate the allegation by any evidence whatsoever, including from Vivien Wyser-Pratte's deposition.

[4] Guy Wyser-Pratte and Vivien Wyser-Pratte each testified that Longmire first disclosed his racial background to Guy Wyser-Pratte in 1993 in the context of allegations by a female co-worker at WPMC that Longmire had sexually harassed her.  (Wyser-Pratte Dep. at 125:18-128:3; Deposition of Vivien Wyser-Pratte dated Mar. 2, 2006 ("Vivien Wyser-Pratte Dep.") at 52:20-53:24, Ferrandino Aff. Ex. 4, Lew Decl. Ex. C.)

[5] At his deposition in this action, Wyser-Pratte stated that he only once used the term "Pollack" – in a deposition taken in connection with a Securities and Exchange Commission investigation – but that he does not consider the term a racial epithet.  (Wyser-Pratte Dep. at 102:17-103:13.)

Furthermore, Longmire conclusorily alleges – without any detail or support whatsoever – that Wyser-Pratte began actively discriminating against him after he disclosed his racial background.  (Pl.'s 56.1 ¶ 25; Longmire Decl. ¶ 14.)  Longmire asserts that Wyser-Pratte's "disdain for plaintiff 'trickled down' to other employees" and cites an incident in 1995 when Longmire was "punched . . . in the face" by Carl Weiss, WPMC's Chief Financial Officer at that time, in full view of other employees.  (Pl.'s 56.1 ¶ 34; Wyser-Pratte Dep. at 168:21-171:3.)  Longmire claims that out of racial animus Wyser-Pratte refused to take any action in response.[6]  (Pl.'s 56.1 ¶ 34.)

As a further example of the allegedly racist atmosphere at WPMC, Longmire recalls that when the acquittal in the O.J. Simpson murder trial was announced in 1995, Longmire found the "racist comments" made by Wyser-Pratte and WPMC employees "unbearable" and he was "forced . . . to hide in the bathroom" to avoid hearing them.  (Longmire Decl. ¶ 21.)  Longmire does not state what those comments were.  Longmire also alleges that his race was a topic of conversation and rumor among WPMC employees, particularly at company functions that Longmire attended with his wife – who is a Turkish national – and child.  (Pl.'s 56.1 ¶ 11; Longmire Decl. ¶¶ 17, 19.)  However, he gives absolutely no substantiation or support for that allegation.

Longmire also alleges that one WPMC employee – Neil O'Hara – complained to him that "niggers had a bad smell."  (Pl.'s 56.1 ¶ 24.)  Another WPMC employee – George Dudla – allegedly once stated that "it should not be a crime when you hit a black man on the head with a baseball bat because you're doing him a favor by improving his intelligence."  (Id.)  Longmire contends that many employees, as well as Wyser-Pratte, laughed at that remark and expressed

---

[6] Wyser-Pratte testified that he offered to speak with Weiss regarding the incident, but that Longmire specifically requested that he not get involved.  (Wyser-Pratte Dep. at 169:3-21.)

agreement.  (Id.)  Longmire further contends that several employees frequently used the word "nigger," sometimes in the presence of Wyser-Pratte.  (Id.)

In response to those allegations by Longmire, Wyser-Pratte testified at his deposition that he never saw any WPMC employee exhibit racist behavior and that he did not recall O'Hara or Dudla making the alleged remarks.  (Wyser-Pratte Dep. at 125:3-16, 152:3-23.)  In addition, defendants submitted affidavits from WPMC employee Michael Kelly and former employee Kurt N. Schacht in which each stated that he "never witnessed racial slurs or epithets made toward or in front of Mr. Longmire" at WPMC.  (Affidavit of Michael M. Kelly dated Oct. 3, 2006 ("Kelly Aff.") ¶ 6; Affidavit of Kurt N. Schacht dated Oct. 3, 2006 ("Schacht Aff.") ¶ 7.)  By contrast, Longmire has not submitted any deposition testimony from either O'Hara or Dudla – or anyone else – to corroborate his allegations concerning the specific alleged statements by O'Hara and Dudla or any other alleged racist remarks.

Longmire also asserts that Wyser-Pratte discriminated directly against him out of racial animus.  In particular, Longmire contends that Wyser-Pratte told him that "blacks did not project the appropriate Wall Street image" and that, with the exception of one client, Wyser-Pratte never permitted Longmire to accompany him on marketing calls to meet potential investors.[7] (Longmire Decl. ¶ 25.)  Longmire cites a specific instance in which Wyser-Pratte allegedly told him – with reference to Kurt N. Schacht – that "he wanted to show a white face to potential investors" and that Longmire "had to make a sacrifice for the franchise."  (Longmire Decl. ¶ 39.)

Longmire further contends that Wyser-Pratte refused due to racial animus to assist Longmire with sponsorship for purposes of becoming a registered broker with the National Association of Securities Dealers, even though he did sponsor Wolfgang Armbruster for that

[7] At his deposition, Wyser-Pratte cited at least four times that Longmire traveled with Wyser-Pratte on marketing trips to visit investors.  (Wyser-Pratte Dep. at 153:13-154:24.)

purpose.  (Pl.'s 56.1 ¶ 45; Longmire Decl. ¶¶ 26, 35.)  In addition, Longmire asserts that Wyser-

Pratte refused – again on the basis of racial animus – a request for a two-week honeymoon in

1997.  (Pl.'s 56.1 ¶ 26; Longmire Decl. ¶ 41.)  Wyser-Pratte allegedly told Longmire that

"[p]eople like you don't deserve honeymoons."  (Pl.'s 56.1 ¶ 26.)  Finally, in December 2002

Longmire suffered a serious shoulder injury while vacationing in Utah.  (Pl.'s 56.1 ¶ 30;

Longmire Decl. ¶ 42.)  Wyser-Pratte refused to give him time off to recover, even though white

employees were allegedly allowed time off for medical procedures.[8]  (Pl.'s 56.1 ¶¶ 31-33;

Longmire Decl. ¶¶ 43-44, 46.)

       E.      <u>Wyser-Pratte's Divorce Proceedings</u>

During the course of his employment at WPMC, Longmire developed a friendship with

Wyser-Pratte's wife, Vivien Wyser-Pratte.  (Def.'s 56.1 ¶ 20; Pl.'s Rep. 56.1 ¶ 20.)  Mrs. Wyser-

Pratte learned of Longmire's mixed race in the early 1990s from her husband.  (Def.'s 56.1 ¶ 11;

Pl.'s Rep. 56.1 ¶ 11; Vivien Wyser-Pratte Dep. at 52:2-53:3.)  In October 2003, Wyser-Pratte

filed for a divorce from his wife.  (Def.'s 56.1 ¶ 22.)

Longmire asserts that during the December 2003 – January 2004 period, Wyser-Pratte

demanded that Longmire testify falsely in those divorce proceedings in order to impugn Mrs.

Wyser-Pratte's credibility.  (Pl.'s 56.1 ¶ 53; Longmire Decl. ¶ 47.)  Longmire contends that

Wyser-Pratte was afraid that his wife would reveal incriminating information in connection with

a then underway Securities and Exchange Commission ("SEC") insider trading investigation of

Wyser-Pratte and WPMC.  (Pl.'s 56.1 ¶ 53.)  Although the nature of the proposed perjury is

unclear, Wyser-Pratte and his legal counsel are alleged to have asked Longmire to testify falsely

---

[8] Wyser-Pratte did recall Longmire's shoulder injury at his deposition, but testified that he gave Longmire the option of working from home.  (Wyser-Pratte Dep. at 162:9-21; 166:19-167:1.)  Other than defendants' assertion that WPMC "allowed its employees adequate leave time when warranted and as required by law," there is no proof in the record regarding the particular leave treatment of specific employees.  (Ans. to Sec. Am. Compl. ¶ 70.)

regarding matters related to the SEC investigation in order to contradict Mrs. Wyser-Pratte.[9]
(Def.'s 56.1 ¶ 23; Pl.'s Rep. 56.1 ¶ 23; Pl.'s 56.1 ¶¶ 55, 71; Longmire Decl. ¶ 53.)  The alleged
conversations between Longmire and Wyser-Pratte regarding his potential testimony did not
include references to Longmire's race or racial background.  (Def.'s 56.1 ¶ 23; Pl.'s Rep. 56.1 ¶
23.)

     Nonetheless, Longmire describes Wyser-Pratte's demand as "an illegal job assignment"
for which he was "specifically targeted" because of his race.  (Pl.'s 56.1 ¶¶ 53, 55.)  Specifically,
Longmire contends that because Wyser-Pratte was privy to Longmire's purported racial "secret,"
Wyser-Pratte sought to use that information as leverage to blackmail Longmire and compel his
false testimony.  (Pl.'s 56.1 ¶ 55.)  Ultimately, Longmire refused to testify on Wyser-Pratte's
behalf in the divorce proceedings, despite Wyser-Pratte's alleged statement to Longmire that
"[i]f you don't hold the line, you'll go down," Pl.'s Rep. 56.1 ¶ 23; Longmire Decl. ¶¶ 48, 52,
and Wyser-Pratte's alleged statement on January 9, 2004 that "[i]f you don't testify the way I
want you to, I'm going to 'out' you.  If you don't lie for me, you're dead.  Think of your
family."[10]  (Pl.'s 56.1 ¶ 60; Longmire Decl. ¶ 54.)

     F.    The Termination of Longmire's Employment at WPMC

     After the alleged January 9, 2004 interaction, Wyser-Pratte and Longmire were no longer
speaking to each other and Longmire began working from home in late January 2004.  (Def.'s
56.1 ¶ 25; Pl.'s Rep. 56.1 ¶ 25; Pl.'s 56.1 ¶¶ 61, 66; Longmire Decl. ¶¶ 56, 60.)  He was
terminated as of January 31, 2004 and then reinstated on March 1 – ostensibly to facilitate

---

[9] In contrast, defendants assert that Wyser-Pratte asked Longmire to testify in the divorce proceedings because of
statements that Mrs. Wyser-Pratte had allegedly made to Longmire regarding the financial prospects of WPMC.
(Def.'s 56.1 ¶¶ 21-23; Wyser-Pratte Dep. at 177:14-18.)

[10] Although the Court assumes that those statements were made for purposes of this motion, Wyser-Pratte testified at
his deposition that he never made them or "anything of the kind."  (Wyser-Pratte Dep. at 216:5-16.)

settlement discussions of the parties' disputes.  Finally, he was terminated a second time on

March 31.  (Pl.'s 56.1 ¶¶ 73-76; Wyser-Pratte Dep. at 233:9-15.)

In April 2004, Wyser-Pratte informed Laurent Guillome, a mutual professional

acquaintance of Longmire and Wyser-Pratte, of plaintiff's racial background.  (Def.'s 56.1 ¶ 26;

Pl. Rep. 56.1 ¶ 26; Pl. 56.1 ¶ 80.)  Longmire claims that he sent Guillome to Wyser-Pratte as a

"tester" to see whether Wyser-Pratte would disclose plaintiff's racial background to Guillome.

(Pl. Rep. 56.1 ¶ 26.)  Wyser-Pratte claims that Longmire sent Guillome to him in order to urge

Wyser-Pratte to reach a settlement with Longmire and that it was in the context of Wyser-Pratte

discussing the earlier sexual harassment charge involving Longmire that Wyser-Pratte referred to

Longmire's race.  (Wyser-Pratte Dep. at 216:24-219:12.)  No testimony from Guillome was

submitted by either party.  Longmire contends that Wyser-Pratte also disclosed the information

to his own lawyers who were present.  (Def.'s 56.1 ¶ 27; Pl.'s 56.1 ¶ 80; Longmire Decl. ¶ 67.)

Finally, Longmire asserts that defendants ignored his requests for access to both his

401(k) account and to deferred compensation held in a Bank of Bermuda account.  (Longmire

Decl. ¶ 68.)  Longmire construes the continued refusal of defendants to grant him access to those

funds for a brief period after his termination as retaliation for his refusal to commit perjury.

(Pl.'s 56.1 ¶ 83.)  However, Longmire was able to access his 401(k) account in May 2004, a

mere two months after his termination.  (Def.'s 56.1 ¶ 29; Pl.'s Rep. 56.1 ¶ 29; Pl.'s 56.1 ¶ 84.)

In regard to the deferred compensation, Longmire claims he was owed approximately

$600,000 by WPMC; that the terms of his deferred compensation agreement permitted

withdrawal on demand; and that defendants allegedly refused to give him access to those funds

on the basis that he had agreed in writing not to withdraw the money until 2005.  (Pl.'s 56.1 ¶¶

85-86.)  However, Longmire received the balance of the funds owed to him in December 2004.

(Def.'s 56.1 ¶ 30; Letter from Wyser-Pratte to Longmire dated Dec. 21, 2004, Ferrandino Aff. Ex. 21.)

        G.      <u>History of this Action</u>

In November 2004, Longmire filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and the SDHR.  In March 2005, the EEOC dismissed the charge for lack of jurisdiction – WPMC employed fewer than fifteen employees – and issued a "right to sue" letter to Longmire.  Plaintiff then sought to have his SDHR petition dismissed and to have his election of remedies annulled; that request was granted in May 2005.

Plaintiff then brought this action on July 26, 2005, and, as noted above, after extensive discovery proceedings and motion practice, defendants have now moved pursuant to Fed. R. Civ. P. 56 for summary judgment dismissing the second amended complaint.

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only if the evidence shows that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); <u>see</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); <u>Allen v. Coughlin</u>, 64 F.3d 77, 79 (2d Cir. 1995).  In determining whether a genuine issue of material fact exists, the Court "is to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought."  <u>Patterson v. County of Oneida</u>, 375 F.3d 206, 219 (2d Cir. 2004).

"Moreover, as discrimination will seldom manifest itself overtly, courts must be alert to the fact that employers are rarely so cooperative as to include a notation in the personnel file that the firing is for a reason expressly forbidden by law."  <u>Bickerstaff v. Vassar College</u>, 196 F.3d 435, 448 (2d Cir. 1999) (internal quotation marks omitted). "However, they must also carefully

distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture."  Id.  "[E]ven in the discrimination context, a plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment," Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997), and "instead must offer some hard evidence showing that [his] version of the events is not wholly fanciful," Golden Pacific Bancorp. v. Fed. Deposit Ins. Co., 375 F.3d 196, 200 (2d Cir. 2004) (quoting D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998)).

III.   **DISCUSSION**

A.   Longmire's Employment Discrimination Claims

Longmire claims that defendants discriminated against him on the basis of race in violation of 42 U.S.C. § 1981, which protects the right to "make and enforce contracts" – including "the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship" – against "impairment by nongovernmental discrimination."  42 U.S.C. § 1981. Longmire also alleges discrimination on the basis of race in violation of the NYHRL and the NYCHRL.  Specifically, Longmire asserts that the racial discrimination in this case took the form of (1) Wyser-Pratte's threat to disclose Longmire's "racial secret"; (2) a hostile work environment; (3) Longmire's disparate compensation compared to his non-black colleagues at WPMC; and (4) retaliation against Longmire.

To establish a racial discrimination claim pursuant to section 1981, a plaintiff must show that (1) he is a member of a racial minority group, (2) defendants intended to discriminate against him on the basis of race, and (3) this discrimination concerned one of the activities enumerated in the statute.  Brown v. City of Oneonta, 221 F.3d 329, 339 (2d Cir. 1999).  New York courts apply the same standards as those applied by federal courts when assessing

discrimination and retaliation claims.  See Weinstock v. Columbia Univ., 224 F.3d 33, 42 n.1 (2d

Cir. 2000); Bandhan v. Lab. Corp. of Am., 234 F. Supp. 2d 313, 317 (S.D.N.Y. 2002).

It is undisputed that Longmire has established the first element of a racial discrimination

claim – he is African-American and is therefore entitled to the protections of 42 U.S.C. § 1981,

the NYHRL, and the NYCHRL.  A plaintiff's efforts to establish the second element of a section

1981 claim are subject to the same burden-shifting analysis as intentional discrimination claims

brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.  See Gant ex

rel. Gant v. Wallingford Bd. Of Educ., 195 F.3d 134, 146 (2d Cir. 1999).  Under that framework,

a plaintiff must first make out a prima facie case of discrimination; the defendant must then

produce a legitimate, nondiscriminatory reason for its actions; if such a reason is offered, the

final burden rests with the plaintiff to prove that, despite the proffered nondiscriminatory reason,

the defendant intentionally discriminated against the plaintiff on the basis of race.  McDonnell

Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).

However, the timeliness of Longmire's claims is also at issue.  Claims brought pursuant

to 42 U.S.C. § 1981 are subject to a "catch-all" four-year statute of limitations prescribed by 28

U.S.C. § 1658, Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369, 382-83, 124 S. Ct. 1836, 158

L. Ed. 2d 645 (2004), and discrimination claims brought pursuant to the NYHRL and the

NYCHRL are governed by three-year statutes of limitations, N.Y. CPLR § 214(2); N.Y.C.

Admin. Code § 8-502(d); Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 714 (2d Cir.

1996); Lambert v. Genesee Hosp., 10 F.3d 46, 59 (2d Cir. 1993).

The Court will consider each of Longmire's allegations of racial discrimination in turn,

including whether those claims are timely.

1.    ***The Threat To Disclose Longmire's "Racial Secret"***

Longmire contends that Wyser-Pratte threatened to – and eventually did – expose his "dual race" background, which Longmire claims was a "closely guarded secret."  This claim must fail, however, because Longmire's racial background was <u>not</u> secret and, even if it had been, the conduct complained of is not legally actionable pursuant to state or federal employment discrimination law.

a.    *Longmire's Race Was Not a "Secret"*

It is undisputed that Longmire is "black" in the sense that his father is African-American. It is also undisputed that Longmire described himself as "black" in documents publicly filed in a lawsuit alleging racial discrimination against the board of his apartment cooperative in 1995. Accordingly, Longmire's self-classification as "black" was already a matter of public record as of January 9, 2004 – the date on which Wyser-Pratte allegedly threatened to disclose that information to others.

In addition, Longmire concedes that he personally disclosed his racial background to various individuals in the financial services industry, including – at a minimum – Wyser-Pratte, Deborah Draughan – an African-American consultant to WPMC – and, many years earlier, Praveen Sharma, a colleague at Prudential.  It is also undisputed that Longmire "expressed an interest" to the Stanford Business School Black Alumni Association "to help other blacks" seeking employment on Wall Street.

Even if Longmire's description of his race was not in fact widely known in his own professional circles, the above facts prevent the Court from accepting Longmire's contention that his racial background was a "secret" that Wyser-Pratte could meaningfully exploit.

b.      *Disclosure of Longmire's Race Is Not Actionable Conduct*

Even if the facts told a different story, however, plaintiff has failed to demonstrate that 42 U.S.C. § 1981, the NYHRL, or the NYCHRL create liability for the unauthorized, public disclosure of a person's race or racial background.[11]  Rather than relying on those statutes, plaintiff instead asserts that a constitutional "zone of privacy" prohibits the disclosure or dissemination of private information, see Whalen v. Roe, 429 U.S. 589, 599, 97 S. Ct. 869; 51 L. Ed. 2d 64 (1977), and, in turn, that threats to violate that privacy by a non-governmental employer – at least where the information relates to race – are therefore actionable under state and federal employment discrimination laws.

In Whalen, the constitutionality of a New York statute which required the state to be provided with a copy of prescriptions for certain drugs was challenged by physicians and patients.  The United States Supreme Court upheld the statute, but also found that the constitutional right to privacy extends to "the individual interest in avoiding disclosure of personal matters," id. at 598-99, a principle reaffirmed one year later in Nixon v. Administrator of General Servs., 433 U.S. 425, 457, 97 S. Ct. 2777; 53 L. Ed. 2d 867 (1977).  See also United States Dep't of Justice v. Reporters Comm. For Freedom of the Press, 489 U.S. 749, 770, 109 S. Ct. 1468, 103 L. Ed. 2d 774 (1989).

In his attempt to extrapolate that principle to his own case, Longmire points to the holdings of Sterling v. Borough of Minersville, 232 F.3d 190 (3d Cir. 2000), Doe v. Town of Plymouth, 825 F. Supp. 1102 (D. Mass. 1993), and CBS, Inc. v. Partee, 556 N.E.2d 648 (Ill. App. Ct. 1990).  Not only are all three of those decisions from beyond this Circuit, but those actions each arose either in response to conduct by government officials or to statutes or

---

[11] That failure is not surprising; no federal statute expressly extends privacy protection to factual information regarding a person's race.  See Anita L. Allen, Equal Citizenship: Race and Ethnicity: Race, Face, and Rawls, 72 Fordham L. Rev. 1677, 1686 (2004).

regulations requiring the disclosure of information.  Here, defendants are not government officials or private parties acting under color of state law and plaintiff has not challenged any statute or regulation.[12]  Accordingly, this Court finds that Longmire has not established that Wyser-Pratte's alleged threat to disclose Longmire's race – and his eventual disclosure of that information – constitutes employment discrimination that is actionable pursuant to 42 U.S.C. § 1981, the NYHRL, or the NYCHRL.  As a result, that claim must be dismissed.

### 2.   *Hostile Work Environment*

#### a.   *Legal Standard*

To sustain a claim for hostile work environment, the plaintiff must demonstrate "(1) that his workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of his work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer."  Schwapp, 118 F.3d at 110 (internal quotation marks, citations, and brackets omitted); see also Alfano v. Costello, 294 F.3d 365, 373 (2d Cir. 2002).  That standard is essentially the same whether the claim is brought pursuant to federal or New York law.[13]  See Weinstock, 224 F.3d at 42 n.1; Lederer v.

---

[12] The only case cited by Longmire regarding the conduct of non-state actors is 119-121 East 97th Street Corp. v. New York Comm'n on Hum. Rts., 220 A.D.2d 79, 642 N.Y.S.2d 638 (1st Dep't 1996).  There, an intermediate New York appellate court upheld a finding of discrimination in violation of the NYCHRL where a tenant's landlord notified other tenants and the tenant's employer that the tenant was homosexual and HIV-positive.  220 A.D.2d at 81, 86.  Longmire contends that this supports the proposition that disclosure of membership in any protected class may serve as the basis for a NYCHRL claim.  This Court cannot accept that argument.  First, 119-121 East 97th Street Corp. did not involve the disclosure of information relating to race; medical condition is not equivalent to race.  Second, that case arose in the context of housing – not employment – discrimination.  Third, there is no indication that the tenant's sexual orientation and HIV status had already been publicized by the tenant himself.  In sum, 119-121 East 97th Street Corp. does not support Longmire's position.

[13] However, "the standards for imputing liability to the employer are different."  Huaman v. Am. Airlines, Inc., No. 00-CIV-6336, 2005 U.S. Dist. LEXIS 21777, at *5 (E.D.N.Y. Sept. 29, 2005).  On a federal claim, "[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively highly) authority over the employee."  Faragher v. City of Boca Raton, 524 U.S. 775, 807, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998).  "Under § 296 of the [NYHRL] and § 8-107 of the NYCHRL an employer cannot be held liable . . . for an employee's discriminatory act unless the employer became a party to it by encouraging, condoning, or approving it."  Huaman, 2005 U.S. Dist. LEXIS 21777, at *12 (citation and internal quotations omitted).

BP Prods. N. Am., No. 04 Civ. 9664, 2006 U.S. Dist. LEXIS 87368, at *29 (S.D.N.Y. Dec. 1, 2006).

"The first element of a hostile work environment claim has both an objective and subjective component: the misconduct must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive."  Petrosino v. Bell Atlantic, 385 F.3d 210, 221 (2d Cir. 2004) (internal quotation marks and citations omitted).  With respect to the objective component, the Court must examine "all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 116, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002) (internal citations and quotation marks omitted).  "Whether racial slurs constitute a hostile work environment typically depends upon the quantity, frequency, and severity of those slurs," Schwapp, 118 F.3d at 110-11 (internal quotation marks and citations omitted), and "there must be more than a few isolated incidents of racial enmity," id. at 110 (quoting Snell v. Suffolk County, 782 F.2d 1094, 1103 (2d Cir. 1986)) (internal quotation marks omitted).  Indeed, "instead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments." Id. at 110 (internal citations and quotation marks omitted).

b.      *Timeliness*

Longmire alleges that Wyser-Pratte and WPMC employees made derogatory comments regarding Longmire's race and ethnicity over a period of approximately thirteen years, dating back to 1991.  Defendants contend that because Longmire's hostile work environment claim pursuant to 42 U.S.C. § 1981 is subject to a four-year statute of limitations, any conduct alleged

to have taken place more than four years prior to the date of the last act of discrimination is not actionable.  That argument, however, misinterprets the statute of limitations on hostile work environment claims.

The U.S. Supreme Court has made clear – in the closely related context of Title VII claims – that "[h]ostile work environment claims are different in kind from discrete acts" in that "their very nature involves repeated conduct."  Morgan, 536 U.S. at 115.  Accordingly, "[p]rovided that an act contributing to the claim" takes place within the limitations period, "the entire time period of the hostile environment may be considered by a court for the purposes of determining liability."  Id. at 117.  See Milani v. IBM Corp., 322 F. Supp. 2d 434, 452-53 (S.D.N.Y. 2004) (applying Morgan to NYHRL and NYCHRL claims); Staff v. Pall Corp., 233 F. Supp. 2d 516, 527 (S.D.N.Y. 2002) (applying Morgan to section 1981 and NYHRL claims); Huaman v. Am. Airlines, Inc., No. 00-CIV-6336, 2005 U.S. Dist. LEXIS 21777, at *13-14 (Sept. 29, 2005) (applying Morgan to section 1981, NYHRL and NYCHRL claims).  Accordingly, Longmire need only show that some conduct contributing to the alleged hostile work environment took place within the four years (or, for purposes of his state law claims, the three years) prior to July 26, 2005, the date of the initial complaint in this action.

In that respect, it is not entirely clear that Longmire has succeeded – i.e., that he has alleged specific actionable conduct within that period of time; most of the specific offensive conduct alleged by Longmire occurred prior to 2001.  Nonetheless, the Court need not wrestle with that question; even after considering all of the alleged conduct, the Court finds that Longmire relies exclusively on his own conclusory allegations – which are wholly and uniformly uncorroborated – and therefore has failed to demonstrate a sufficient factual basis to support a hostile work environment claim.

c.    *Discussion*

For purposes of this motion, the Court accepts the general allegation that Wyser-Pratte and other WPMC employees made racist and offensive comments in the workplace from 1991 to 2004. The specific comments attributed to Wyser-Pratte and WPMC employees O'Hara and Dudla regarding African-Americans are without doubt inappropriate and offensive. In addition, the allegation that Wyser-Pratte refused to bring Longmire to meetings with clients because he wanted "to show a white face to potential investors" and "blacks did not project the appropriate Wall Street image" is deeply troubling.[14]   (Longmire Decl. ¶¶ 25, 39.)  Furthermore, it may well have been distasteful for WPMC employees to speculate about Longmire's racial heritage – or his wife's – behind his back.

Nonetheless, the Court finds that Longmire has failed to allege comments, incidents, or other conduct that are "severe and pervasive enough," Petrosino, 385 F.3d at 221, to require a trial on the hostile work environment claim. Because Longmire points to fewer than a dozen specific incidents over a thirteen-year period, the Court cannot conclude that "the frequency of the discriminatory conduct," Morgan, 536 U.S. at 116, amounted to "a steady barrage of opprobrious racial comments." Schwapp, 118 F.3d at 110. Indeed, Longmire has identified relatively few specific incidents – as offensive as each particular allegation might be – given the fact that his allegations span more than a decade. Furthermore, there is no credible suggestion that the offensive conduct was "physically threatening,"[15] Morgan, 536 U.S. at 116, or – setting aside the subsequent alleged disclosure of Longmire's "racial secret" – that Longmire was publicly humiliated by the sporadic alleged racist jokes and comments. In a sense, Longmire's

---

[14] The comments are also confusing in the context of this case. If, as Longmire contends, he does not appear to be "black," it is unclear why Wyser-Pratte would have feared that Longmire would not present an "appropriate" image.
[15] As noted above, Longmire alleges one incident in which he was "punched" by a WPMC employee, but he has not offered facts to even suggest that racial animus was at play.

assertion that his race was <u>not</u> generally known undermines his claims here; even if Longmire was offended or hurt by the alleged remarks, none of those remarks were directed at him – indeed, they could not have been if WPMC employees (other than Wyser-Pratte) did not know that he was black.  In short, there is no indication that WPMC employees viewed those offensive jokes and remarks as a means of humiliating Longmire specifically.  Finally, Longmire has not produced a single statement from any witness that corroborates his hostile work environment claims, despite the fact that numerous WPMC employees would likely have witnessed some of the alleged conduct at one time or another and in the face of extensive and explicit denials by Wyser-Pratte and others.  (Wyser-Pratte Dep. at 98:21-99:4, 100:12-25, 125:3-16, 152:3-23, 169:3-21, 171:10-15, 216:5-16; Kelly Aff. ¶ 6; Schacht Aff. ¶ 6.)

Furthermore, the Court is not persuaded by Longmire's hypothesis that other comments – which make no mention of Longmire's race – were motivated by racial animus.  For example, Wyser-Pratte's alleged comment to Longmire that "[p]eople like you don't deserve honeymoons" bears no racial animus on its face.  That type of comment – while certainly not reflective of a good working relationship between Longmire and Wyser-Pratte – provides scant support for a hostile work environment claim.  <u>See</u> <u>Forrest v. Jewish Guild for the Blind</u>, 3 N.Y.3d 295, 312, 786 N.Y.S.2d 382, 819 N.E.2d 998 (2004) ("sheer rudeness" is "irrelevant" where racial discrimination cannot be established).  Furthermore, Longmire himself testified that Wyser-Pratte's alleged statement to him in January 2004 that "you'll go down" for refusing to testify was "not a race-based threat."  (Longmire Dep. at 169:18-21.)

Finally, the threat to disclose Longmire's alleged "racial secret" similarly fails to support Longmire's hostile work environment claim.  A hostile work environment claim "cannot be said to occur on any particular day," <u>Morgan</u>, 536 U.S. at 115, but that is essentially what Longmire

would have this Court find – that Wyser-Pratte's explicit threat to disclose Longmire's "racial secret" transformed a deteriorating employer-employee relationship into a hostile work environment permeated by racial animus.  Simply put, even accepting the unsupported allegations as true, the Court cannot reach that conclusion.  As such, the Court need not reach the secondary question of whether the alleged conduct of WPMC employees can, in turn, be imputed to defendants.  In sum, plaintiff has failed to set forth sufficient facts to withstand defendants' motion for summary judgment in their favor on the hostile work environment claim.

3. ***Disparate Pay***

Longmire contends that after he disclosed his racial background to Wyser-Pratte in 1991, Wyser-Pratte engaged in a pattern of gradually giving Longmire greater responsibility at WPMC, but refusing to increase his compensation accordingly.  Longmire attributes that pattern of conduct to racial animus.

a. *Legal Standard*

To evaluate a disparate pay claim premised on racial discrimination, federal courts apply the burden shifting analysis of McDonnell Douglas set forth above.  See Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).  The same analysis applies to claims brought pursuant to the NYHRL and the NYCHRL.  See Forrest, 3 N.Y.3d at 305 n.3.

In order to make out a prima facie case of disparate pay pursuant to 42 U.S.C. § 1981, a plaintiff must show (1) he is a member of a protected class; (2) he was paid less than similarly situated nonmembers of his protected class; and (3) evidence of discriminatory animus.  Belfi v. Prendergast, 191 F.3d 129, 139 (2d Cir. 1999).  In order to be considered "similarly situated, the individuals with whom [plaintiff] attempts to compare [himself] must be similarly situated in all material respects."  Shumway v. United Parcel Serv., Inc., 118 F.3d 60, 64 (2d Cir. 1997)

(internal citation and quotation marks omitted).  "[T]here should be a reasonably close resemblance of facts and circumstances.  What is key is that they be similar in significant respects."  Lizardo v. Denny's, Inc., 270 F.3d 94, 101 (2d Cir. 2001) (internal citations omitted).

b.       *Timeliness*

The U.S. Supreme Court has recently explained that "[b]ecause a pay-setting decision is a 'discrete act,'" the period for filing a claim "begins when the act occurs."  Ledbetter v. Goodyear Tire & Rubber Co., Inc., 550 U.S. __, 127 S. Ct. 2162, 2165, 167 L. Ed. 2d 982 (2007).  In contrast to a hostile work environment, each discriminatory pay-setting decision is deemed "a separate actionable 'unlawful employment practice' . . . that is temporally distinct."  Id. at 2175 (quoting Morgan, 536 U.S. at 114, 117).  In light of Ledbetter, this Court may consider only those pay-setting decisions that were made during the four-year statute of limitations period for actions brought pursuant to 42 U.S.C. § 1981 – i.e., pay-setting decisions made during the four years prior to July 26, 2005, the date this action was filed.

c.       *Discussion*

Looking only to the period from July 26, 2001 to March 31, 2004 – the date Longmire was terminated – the Court finds that Longmire alleges only one discrete pay-setting decision for purposes of his disparate pay claim: the decrease in his base salary from $150,000 to approximately $130,000 during 2003.  Longmire's 10% share of the incentive fees remained the same throughout the 2001-2004 period.

With respect to that pay-setting decision – and to his general level of compensation during the 2001-2004 period – Longmire compares himself to Kurt N. Schacht – the Chief Legal Officer at the relevant time.[16]  As described above, Schacht – who is white – received an annual

---

[16] Longmire also compares his compensation in various roles to the compensation of his non-black predecessors in those roles – including former Director of Research Phoebe Yen, former Assistant Portfolio Manager Neil O'Hara,

base salary of $170,000.  (See Employment Agreement of Kurt N. Schacht, Esq., dated May 14,

2001, Ferrandino Aff. Ex. 17.)  Schacht was also entitled to an annual incentive bonus of the

greater of $320,000 or 5% of WPMC's net profits generated from assets under WPMC

management.[17]  (Id.)  By comparison, Longmire was paid an annual base salary of $150,000

during 2001.  Longmire's 10% incentive fee share at that time was greater than Schacht's 5%

share, but Longmire lacked a guaranteed minimum bonus.  In addition, Schacht was entitled to

25 vacation days per year.  (Id.)  By contrast, Longmire alleges that he was allowed only 10

vacation days per year.  (Compl. ¶ 86.)  Finally, as noted above, the base salaries of both

Longmire and Schacht were each reduced in 2003 following the loss of a major client –

Schacht's to $125,000 and Longmire's to $130,000.

        Notwithstanding this comparison, the Court finds that Longmire has failed to demonstrate

that he and Schacht were "similarly situated" employees.  Although both Longmire and Schacht

reported to Wyser-Pratte, Schacht allegedly played an important role in attracting new investors

to WPMC, and Schacht's status as a registered trader gave him an advantage over Longmire in

that respect.  And, of course, Schacht, as Chief Legal Officer, had legal functions to perform that

Longmire did not.  By contrast, Longmire's responsibilities included investment-making

decisions – a role that Schacht did not play at WPMC.

        Although both Longmire and Schacht were high-ranking employees at WPMC, Longmire

has failed to provide the Court with a fact-based comparison of their responsibilities; he instead

relies on titles.  The fact that Schacht was perhaps more responsible for generating new business

---

and former Research Analyst Wolfgang Armbruster – but those pay-setting decisions were made prior to July 26,
2001 and are not actionable here. Nonetheless, it bears noting that, for example, although Armbruster's $120,000
base salary was higher than Longmire's for most of 2000, Longmire earned over $800,000 in overall compensation
that year – more than Armbruster received.  (Def.'s 56.1 ¶ 18; Pl.'s 56.1 Rep. ¶ 18.)

[17] Schacht also stood to receive a 10% incentive fee share of any profits derived from the assets of new clients
brought to WPMC by Schacht.  (See Ferrandino Aff. Ex. 17.)

and that Longmire was perhaps more involved in the day-to-day investment decisions of the firm suggests that their roles were distinct.  Longmire has failed to show that he and Schacht were similarly situated "in all material respects."  Shumway, 118 F.3d at 64.  See also Kent v. Papert Cos., Inc., 309 A.D.2d 234, 244-45, 764 N.Y.S.2d 675 (1st Dep't 2003).

Longmire has also failed to address other potential factors such as differences in past work experience, education, or other credentials.  See DeJesus v. Starr Tech. Risks Agency, Inc., No. 03 Civ. 1298, 2004 U.S. Dist. LEXIS 19213, at *29-30 (S.D.N.Y. Sept. 27, 2004); Quarless v. Bronx-Lebanon Hosp. Center, 228 F. Supp. 2d 377, 383 (S.D.N.Y. 2002).  For example, Schacht held a law degree – which Longmire did not – and came to WPMC after spending years at other financial institutions.  (WPMC biography of Kurt N. Schacht, Ferrandino Aff. Ex. 18.)  In addition to their different roles at WPMC, their different types of experience make clear that Schacht and Longmire were not similarly situated for purposes of a disparate pay claim.

Furthermore, Longmire has not submitted any evidence regarding what a person with responsibilities similar to his at a comparable investment company of similar size and activity might have earned – absent race-based discrimination – during the relevant period.  See Quarless, 228 F. Supp. 2d at 384-85 (rejecting plaintiff's disparate pay claim in part by comparing plaintiff's salary to those of people holding the same type of position "in New York and around the country").

Because Longmire has failed to satisfy the second prong of the test for an unequal pay claim – that he was paid less than similarly situated nonmembers of his protected class – the Court need not examine whether Longmire has raised a genuine issue of fact regarding the alleged discriminatory animus, the third prong of any claim based on disparate pay.

4.      *Retaliation*

Longmire asserts that he was retaliated against in four ways: (1) he was pressured by Wyser-Pratte to commit perjury in Wyser-Pratte's divorce proceedings; (2) he was threatened with the disclosure of his racial background; (3) he was terminated on January 31, 2004, briefly reinstated, and finally terminated on March 31, 2004; and (4) he was denied access to his 401(k) account until May 2004 and to certain deferred compensation until December 2004.  All of the alleged retaliation took place in 2004.

a.      *Legal Standard*

A retaliation claim may be brought pursuant to 42 U.S.C. § 1981, but the retaliation alleged must have taken place in response to the claimant's assertion of rights that are protected by that statute.  Hawkins v. 1115 Legal Serv. Care, 163 F.3d 684, 693 (2d Cir. 1998).  Similarly, the NYHRL makes it "unlawful" for an employer to "discriminate against any person because he or she has opposed any practices forbidden under this article . . . ," N.Y. Exec. L. § 296(e), and the NYCHRL forbids retaliation against an employee who challenges an act of unlawful discrimination in his employment.  N.Y.C. Admin. Code § 8-107(1).  Even if the retaliation does "not result in an ultimate action with respect to employment" or "a materially adverse change in the terms and conditions of employment," the retaliatory act may be actionable if it was "reasonably likely to deter a person from engaging in protected activity."  Id.

Again, Longmire's state and federal retaliation claims are evaluated pursuant to the tripartite burden shifting framework established in McDonnell Douglas.  See Terry v. Ashcroft, 336 F.3d 128, 141 (2d Cir. 2003)  To establish a prima facie case of retaliation Longmire must show: (1) that he engaged in protected activity; (2) his employer was aware of this activity; (3) an employment action was taken disadvantaging him; and (4) a causal connection between the

protected activity and the adverse employment action.  See id. (quoting Quinn v. Green Tree

Credit Corp., 159 F.3d 759, 769 (2d Cir. 1998)).

An employment action "disadvantag[es] the plaintiff" if it constitutes "a materially

adverse change in the terms and conditions of employment."  Sanders v. New York City Human

Resources, 361 F.3d 749, 755 (2d Cir. 2004) (internal quotation marks omitted).  To meet this

standard, "a change in working conditions must be more disruptive than a mere inconvenience or

an alteration of job responsibilities," but rather includes the "termination of employment, a

demotion evidenced by a decrease in wage or salary, a less distinguishable title, a material loss of

benefits, [or] significantly diminished material responsibilities . . . ."  Id. (internal quotation

marks omitted).  The requisite "causal connection" can be demonstrated by showing "that the

protected activity was followed closely by discriminatory treatment."  DeCintio v. Westchester

County. Med. Ctr., 821 F.2d 111, 115 (2d Cir. 1987).

b.    *Discussion*

Longmire has failed to establish a prima facie retaliation claim because none of the

alleged retaliatory acts were taken in response to "protected activity" – complaints of

discrimination – engaged in by Longmire.  Terry, 336 F.3d at 141.  For example, Longmire does

not – and cannot reasonably – contend that his request in the early 1990s that Wyser-Pratte and

WPMC employees cease using racial epithets was the basis for the alleged retaliation in 2004,

and he has not otherwise presented credible evidence of more recent informal complaints that

provoked retaliation.[18]  Longmire did not file any formal complaints with state and federal

authorities until November 2004 – eight months after he was terminated.  To the extent

---

[18] Longmire does allege that he complained to Wyser-Pratte and Deborah Draughan about the "discriminatory circumstances" surrounding the hire of Kurt N. Schacht in May 2001.  (Pl.'s 56.1 ¶ 43.)  However, Longmire has neither substantiated those claims in any way nor drawn any connection between the alleged complaints and any retaliatory act.

Longmire asserts that he was retaliated against for refusing to testify on behalf of Wyser-Pratte, that refusal does not fall into the category of "protected activity" envisaged by the relevant federal and state employment discrimination statutes; neither Longmire's refusal to testify – nor the request that he do so – has anything to do with race or racial discrimination.  Even if the Court accepts Longmire's allegation that Wyser-Pratte demanded false testimony from him, the basis for that demand was not Longmire's race, but rather his relationship with Mrs. Wyser-Pratte.

Moreover, to the extent Longmire asserts that Wyser-Pratte's alleged threat and the subsequent disclosure of his racial background constitutes unlawful retaliation, Longmire has not asserted any material disadvantage as a result of the disclosure.  For example, Longmire has failed to adduce credible evidence that he has been prevented from finding employment for that reason; indeed, Longmire testified that prospective employers to whom he has applied remain unaware of his racial background.  (Longmire Dep. at 247: 6-17.)  Similarly, Longmire has failed to show that he suffered a material disadvantage based on the brief period of time during which he did not have access to his 401(k) account or his deferred compensation.  These delays more closely resemble a "mere inconvenience" than a "material loss of benefits."  Sanders, 361 F.3d at 755.

The only employment action taken against Longmire that materially disadvantaged him was his final termination on March 31, 2004.  However, because Longmire has failed to demonstrate that he was retaliated against for engaging in a "protected activity" and, for that matter, any "causal connection" between a protected activity and his termination, Terry, 336 F.3d at 141, the claim must be rejected.  In brief, Longmire has not shown that he engaged in activity – prior to the alleged retaliatory conduct – that is protected by the statutes pursuant to

which he brings this action.  Accordingly, Longmire has failed to demonstrate even a prima facie

case of retaliation and summary judgment must be granted in defendants' favor on this claim.

          B.  <u>Longmire's Common Law Tortious Interference with Contract Claim</u>

Longmire also contends that Wyser-Pratte tortiously interfered with the contractual

employment relationship between Longmire and WPMC by threatening to disclose Longmire's

racial background, subsequently disclosing that information, and demanding that Longmire

testify falsely in his divorce litigation.  Because that conduct directly preceded the termination of

Longmire's employment at WPMC, Longmire construes Wyser-Pratte's conduct as tortious

interference with his employment contract.

          a.  *Legal Standard*

"Under New York law, the elements of a tortious interference with contract claim are: (a)

that a valid contract exists; (b) that a 'third party' had knowledge of the contract; (c) that the

third party intentionally and improperly procured the breach of the contract; and (d) that the

breach resulted in damage to the plaintiff."  <u>Albert v. Loksen</u>, 239 F.3d 256, 274 (2d Cir. 2001)

(quoting <u>Finley v. Giacobbe</u>, 79 F.3d 1285, 1294 (2d Cir. 1996)); <u>see also</u> <u>Antaeus Enters. v. SD-</u>

<u>Barn Real Estate, L.L.C.</u>, 480 F. Supp. 2d 734, 740 (S.D.N.Y. 2007) (quoting <u>Lama Holding Co.</u>

<u>v. Smith Barney</u>, 88 N.Y.2d 413, 424, 646 N.Y.S.2d 76, 668 N.E.2d 1370 (1996)).

Longmire never signed a written employment contract with defendants and was therefore

an at-will employee at WPMC.  <u>See</u> <u>Albert</u>, 239 F.3d at 274 (citing <u>Sabetay v. Sterling Drug,</u>

<u>Inc.</u>, 69 N.Y.2d 329, 333, 514 N.Y.S.2d 209, 506 N.E.2d 919 (1987)); <u>Lobosco v. N.Y. Tel.</u>

<u>Company/NYNEX</u>, 96 N.Y.2d 312, 316, 727 N.Y.S.2d 383, 751 N.E.2d 462 (2001).  In New

York, "an employee serving purely at will, by definition, has no contractual right to avoid

dismissal."[19] Finley, 79 F.3d at 1294-95.  Accordingly, an at-will employee may maintain a tortious interference claim only if he can establish that a "third party used wrongful means to effect the termination such as fraud, misrepresentation, or threats, that the means used violated a duty owed by the defendant to the plaintiff, or that the defendant acted with malice." Albert, 239 F.3d at 274 (internal citations and quotations omitted).

### b.    *Timeliness*

In New York, the statute of limitations for a tortious interference with contract claim is three years.  See N.Y. C.P.L.R. § 214(4); Norris v. Grosvenor Marketing Ltd., 803 F.2d 1281, 1287 (2d Cir. 1986); Cohane v. National Collegiate Athletic Assoc., No. 04 Civ. 181S, 2005 U.S. Dist. LEXIS 44123, at *20-21 (W.D.N.Y. Sept. 27, 2005); Four Finger Art Factory, Inc. v. DiNicola, No. 99 Civ. 1259, 2000 U.S. Dist. LEXIS 1221, at *18 (S.D.N.Y. Feb. 9, 2000). Because Longmire was terminated on March 31, 2004 – within the three-year period preceding the July 26, 2005 complaint – the claim is timely.

### c.    *Discussion*

Accordingly, Longmire's tortious interference claim hinges on whether Wyser-Pratte was a "third party" to Longmire's at-will employment agreement and, if so, whether Wyser-Pratte engaged in "wrongful means to effect the termination."  Longmire cites Albert for the proposition that a "co-employee" may be treated as a third party for purposes of tortious interference "by showing that the co-employee acted outside the scope of [his] authority."  239 F.3d at 275 (internal quotations and citation omitted); see also Finley, 79 F.3d at 1295; Antaeus Enders, 480 F. Supp. 2d at 741 (citing Feigen v. Advance Capital Mgmt. Corp., 150 A.D.2d 281,

---

[19] Furthermore, New York does not recognize the tort of wrongful discharge, Lobosco, 96 N.Y.2d at 316, and "has adamantly refused to allow employees 'to evade the employment at-will rule and relationship by recasting [a] cause of action in the garb of tortious interference with . . . employment.'"  Albert, 239 F.3d at 274 (quoting Ingle v. Glamore Motor Sales, Inc., 73 N.Y.2d 183, 189, 538 N.Y.S.2d 771, 535 N.E.2d 1311 (1989)).

283, 541 N.Y.S.2d 797 (1st Dep't 1989)) ("[T]he director of a corporation ordinarily is not personally liable for causing the corporation to breach its contracts unless grounds exist to pierce the corporate veil."); Kosson v. Algaze, 203 A.D.2d 112, 113, 610 N.Y.S.2d 227 (1st Dep't 1994).  Longmire essentially contends that Wyser-Pratte was an agent of WPMC who acted outside the scope of his authority, with malice, and in only his personal interest – not in the interest of WPMC – and therefore should be deemed a third party to Longmire's employment contract.

However, Wyser-Pratte was not Longmire's co-employee.  On the contrary, Wyser-Pratte was the Chief Executive Officer of WPMC, its sole owner, and Longmire's direct supervisor. He was also the person who originally hired Longmire to work at WPMC.  "[U]nder New York law, a party cannot be held liable for interfering with [his] own contract."  Campbell v. Grayline Air Shuttle, Inc., 930 F. Supp. 794, 804 (E.D.N.Y. 1996); see also Israel v. Wood Dolson Co., 1 N.Y.2d 116, 120, 151 N.Y.S.2d 1, 134 N.E.2d 97 (1956) (plaintiff bringing tortious interference claim must show that defendants were not parties to the contract); Winicki v. City of Olean, 203 A.D.2d 893, 894, 611 N.Y.S.2d 379 (4th Dep't 1994) (only "a stranger to a contract" may be liable for tortious interference.)  In this case, it would be nonsensical to find that Wyser-Pratte induced his wholly owned corporation to terminate Longmire's employment where it was Wyser-Pratte himself – Longmire's only supervisor – who had the sole authority to make that decision.  See Schacht Aff. ¶ 4; see also Finley, 79 F.3d at 1295 (dismissal of tortious interference with employment claim upheld based in part on finding that defendant "had the authority to hire and fire" plaintiff).  Simply put, the Court cannot construe Wyser-Pratte as a "third-party" to Longmire's employment arrangement for purposes of this claim.

Furthermore, to the extent Longmire construes Wyser-Pratte's alleged conduct – i.e., the demand that Longmire testify falsely in his divorce proceedings – as a "threat" which constituted the "wrongful means" to induce his termination, that interpretation misunderstands the nature of tortious interference.  Rather than pointing to the threats that were allegedly directed at him, Longmire would need to point to evidence showing that Wyser-Pratte's threats were directed against WPMC – i.e., against the party that allegedly breached the contract – to establish his tortious interference claim.  He has failed to do so.  As a consequence, Longmire has not established sufficient facts to allow his tortious interference with contract claim against Wyser-Pratte to proceed, and that claim must also be dismissed.

IV.   **CONCLUSION**

In sum, plaintiff has failed to demonstrate that any genuine issue of material fact requires that this action proceed to trial.  Even resolving ambiguities in the record in favor of plaintiff where reasonable and drawing all permissible factual inferences in favor of plaintiff in the many instances where the testimony is in conflict, the Court finds that defendants are entitled to summary judgment on each of plaintiff's claims as a matter of law.

Accordingly, the motion for summary judgment is granted in favor of defendants.  The Clerk of Court is directed to enter judgment dismissing plaintiff's claims with prejudice.

Dated: New York, New York
        September 6, 2007

SO ORDERED:

Sidney H. Stein, U.S.D.J.